[No. D001560. Fourth Dist., Div. One. Jan. 23, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK BRUCE WALKEY, JR., Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, IV, and V.

**COUNSEL**

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steven H. Zeigen and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LOVETT, J.*—**A jury convicted Frederick Bruce Walkey, Jr. of first degree murder (Pen. Code,[1] § 187) and child endangerment (§ 273a, subd. (1)). The court sentenced Walkey to prison for 25 years to life for the murder. The court also imposed but stayed a three-year term for the child endangerment. Walkey appeals.

### FACTS

Walkey and his wife Alicia lived in Oceanside with Ellen Cosby and her two-year-old son Nathanel. Walkey was intimate with Cosby and acted as

---

*Assigned by the Chairperson of the Judicial Council.

[1]All statutory references are to the Penal Code unless otherwise specified.

a substitute father for Nathanel, including physically punishing him. About 1 p.m. on February 17, 1983, Walkey, Cosby and Nathanel went to K-Mart where they had lunch. Nathanel ate and was playful and cheerful. They returned home about 3 p.m. Nathanel was in the backyard with Walkey and then took a nap on the living room couch. About 5:30 p.m., Cosby left to go shopping while Walkey and his wife stayed with Nathanel.

Vickie Helmstadter went to Cosby's house about 6:30 p.m. and found Cosby was not home. Helmstadter saw Walkey coming up the stairs from the cellar carrying Nathanel. When Helmstadter called Nathanel's name, he did not respond. She noticed there was no movement of his legs and his arms were hanging relaxed. She also noticed Walkey looked scared. He told her to go in the house and wait for him.

Walkey put Nathanel in another room and came out to see Helmstadter. She paid Walkey $10 she owed him and left. As she was leaving, Howard Miller and Glenn Faulkner were coming in, looking for Cosby. Walkey told them Cosby was not at home and to come back later. They did not leave. Walkey then said he was going to check on Nathanel. He returned carrying Nathanel, who was motionless, wrapped in blankets. Walkey said Nathanel had defecated in his bed and Walkey was going to clean him up. Miller heard water running in the bathroom. Walkey came out carrying some bed sheets. At Walkey's suggestion, he and Miller and Faulkner went outside to play horseshoes. About 20 minutes later, Walkey's wife called out for them to come in because Nathanel was not breathing.

A paramedic arrived within five minutes and saw Nathanel was not breathing and had no pulse. He also noticed Nathanel looked like he had been severely beaten. Nathanel was covered with bruises and his abdomen was distended. Walkey said he had taken Nathanel out of the bathtub and also said Nathanel had earlier fallen and hit his head.

Nathanel was taken to Tri-City Hospital where resuscitation efforts were unsuccessful. The examining physician pronounced Nathanel dead at 7:29 p.m. The doctor saw bite marks on Nathanel's neck and arms and also saw old and new bruises. An X-ray showed Nathanel had a fractured rib.

An autopsy revealed 17 different bruises, abrasions and lacerations. The fresh bruises probably occurred within two hours of Nathanel's death. Nathanel's facial injuries were most likely the result of a blunt object impacting with relatively severe force. Nathanel's upper body had various abrasions and bruises, including two bite marks inflicted two hours or less before his death. His abdomen was tense and distended due to a large hemorrhage. Nathanel had received a severe penetrating blow, crushing and tearing open

the intestines. The cause of death was related to this blow. Nathanel's injuries were nonaccidental and occurred between 5 and 6:30 p.m.

The pathologist who performed the autopsy testified at trial Nathanel's abdominal injuries were caused by a blow from a blunt object delivered with extreme force such that an average size female would not be able to inflict the injury. The pathologist testified Nathanel would have experienced extreme pain. Shock would set in either immediately or within one-half hour so that Nathanel would be unconscious or in a depressed state.

Nathanel had additional injuries, including a partially healed fractured rib (about two months old), a hemorrhaged spleen and a partially healed torn liver. These injuries indicated Nathanel had received a previous severe abdominal blow at least two weeks before he died. Nathanel also had two large, deep bruises on the back of his head causing life-threatening injury to the brain and surrounding tissue.

Dr. Sperber, a forensic dentist, testified at trial. He had taken photographs and impressions of the bite marks on Nathanel's body. Dr. Sperber also had taken dental impressions of Cosby, Walkey and Mrs. Walkey. Comparing the teeth marks of Nathanel with these dental impressions, Dr. Sperber testified neither Cosby nor Mrs. Walkey could have caused Nathanel's bite marks and he had no doubt Walkey caused them.

Dr. Chadwick, the physician who reviewed the photographs taken of Nathanel at the hospital and during the autopsy, testified Nathanel was a battered child. The number of bruises on Nathanel's body were inconsistent with accidental injuries. He also testified about the various factors that make up the profile of a child abuser.

Walkey testified in his own defense, claiming Nathanel was with him in the cellar for about 10 minutes the day he died. Walkey left the house about 4:30 p.m. and returned about 6:10 p.m. Nathanel was sleeping on the living room couch. Walkey went back to the cellar. Hearing Nathanel cry, Walkey left the cellar and saw Nathanel lying on his face at the bottom of the back door stairway with Nathanel's dog jumping around him. Nathanel's lip was bleeding so Walkey carried him into the house, cleaned his lip and gave him a bath. While bathing Nathanel, Walkey bit him on the forearm because Nathanel had bitten him. Walkey then put Nathanel down on the waterbed in the bedroom. When Walkey returned 10 minutes later to check on Nathanel, he found Nathanel had vomited and was not breathing.

Walkey testified he never struck Nathanel in the abdomen or anywhere else. He testified he loved Nathanel very much.

## DISCUSSION

### I

The prosecution tried the case entirely on a murder by torture theory.[2] Walkey contends the evidence was insufficient to support a conviction of first degree murder by means of torture. He asserts the court erred in denying his motion under section 1118.1[3] to dismiss the first degree murder charge and asserts the court erred in giving a torture murder instruction. We agree the evidence was insufficient to warrant a torture murder instruction.

■ Murder by means of torture is "murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].) The assailant's intent must be "to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death." (*People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51].)

Although a defendant need not have any intent to kill to be convicted of murder by torture, the defendant must have the defined intent to inflict pain. (*People* v. *Steger, supra,* 16 Cal.3d at p. 546, citing *People* v. *Mattison* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193].) Whether a defendant had a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain may be inferred from the circumstances surrounding the killing. ■ Although the severity of the victim's wounds is one circumstance to be considered, undue weight should not be given to such evidence, "as the wounds could in fact have been inflicted in the course of a killing in the heat of passion rather than a calculated torture murder." (*People* v. *Steger, supra,* at p. 546.)

---

[2]Section 189 provides in part: ". . . [M]urder which is perpetrated by means of . . . torture, or by any other kind of willful, deliberate, and premeditated killing" is first degree murder.

[3]Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

In *Steger,* the California Supreme Court modified a first degree torture murder conviction to second degree murder on facts similar to those here. The three-year-old victim in *Steger* died from nonaccidental injuries inflicted over a period of one month. The child's body was covered from head to toe with cuts, bruises and other injuries[4] caused by severe blows. The defendant stepmother admitted being continually frustrated by her inability to control the child's behavior and also admitted striking her to effect discipline. The court held the evidence did not support a conviction of first degree murder and it was error for the court to instruct on murder by torture. (*Id.* at pp. 548-549.)

Here, having reviewed the entire record in the light most favorable to the People, we conclude substantial evidence supports the jury's finding Walkey caused Nathanel's death. The testimony of several witnesses established Walkey was with Nathanel at the time the fatal injuries occurred. There was also testimony Walkey, looking scared, carried a motionless, unresponsive Nathanel wrapped in sheets or a blanket. Walkey bathed Nathanel who was covered with bruises and cuts and was unconscious or in a depressed state, yet Walkey failed to seek medical attention for the child. Further, expert medical testimony established Nathanel's injuries were inflicted with "extreme force" such that a woman would most likely be incapable of causing them. The forensic dentist testified he had no doubt Nathanel's bite marks were caused by Walkey. Walkey admitted biting Nathanel in an effort to discipline him. Thus, the record contains substantial evidence from which a rational trier of fact could have found, beyond a reasonable doubt, Walkey was responsible for Nathanel's death. (See *People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468].)

However, the prosecution failed to prove Walkey murdered Nathanel with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain. Although the medical experts testified Nathanel's injuries would have caused him pain, the amount of pain inflicted on the victim is not determinative of the crime of torture murder. (*People* v. *Wiley* (1976) 18 Cal.3d 162, 173 [133 Cal.Rptr. 135, 554 P.2d 881]; *People* v. *Steger, supra,* 16 Cal.3d at p. 546.) Although evidence was presented Nathanel's injuries had been inflicted over a period of several months, this does not lead to the conclusion Nathanel was tortured. Rather, the fact Nathanel was beaten on numerous occasions shows only "that several distinct 'explosions of violence' took place, as an attempt to discipline a child by corporal punishment . . . ." (*Id.* at pp. 548-549.)

---

[4]The child's injuries included a hemorrhaged liver, adrenal gland, intestines and diaphragm; a lacerated chin; and a fractured left cheekbone and right forearm. These injuries were inflicted at different times. The defendant never sought medical help.

The People argue Walkey had the requisite deliberate and premeditated intent to torture Nathanel because Walkey resented taking care of Nathanel and had been seen spanking him. The People further point to evidence Walkey got upset and yelled at Nathanel when the child had a toilet training accident. However, this evidence merely shows the beatings Walkey inflicted on Nathanel were "a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a criminal sense wilful, deliberate, or premeditated." (*People* v. *Steger, supra,* 16 Cal.3d at p. 548.) Moreover, the prosecution's own witness, Dr. Chadwick, testified as follows: "Most instances of physical abuse are associated at the time of the individual act of abuse with some kind of immediate event that the abuser perceives as a stimulus to this. Maybe it is prolonged crying on the part of the child, maybe it is a toilet training accident, maybe it is something that the infant or child does, something that the infant or child does which may well be within the range of normal behavior for the age, but which the adult caretaker perceives as inappropriate and becomes angry as a result." Such explosive violence on the part of the abusing adult, without more, does not support a torture murder theory. ■ Walkey's intent may have been to punish Nathanel after becoming frustrated or angry because Nathanel misbehaved or had difficulty being toilet trained. However, the record dispels any hypothesis Walkey's primary purpose was to cause Nathanel to suffer. (See *People* v. *Anderson* (1965) 63 Cal.2d 351, 360 [46 Cal.Rptr. 763, 406 P.2d 43].) Accordingly, the court erred in instructing the jury on torture murder.

The evidence does, however, overwhelmingly support a conviction of second degree murder. (See *People* v. *Steger, supra,* at p. 553; *People* v. *Bassett* (1968) 69 Cal.2d 122, 148 [70 Cal.Rptr. 193, 443 P.2d 777]; *People* v. *Tubby, supra,* 34 Cal.2d at p. 79.) Thus, the judgment must be modified accordingly. (§ 1260.)

## II*

·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·

## III

Walkey contends the court erred in allowing Dr. Chadwick to testify about the "battering parent syndrome."[5] We agree with Walkey's assertion this testimony was impermissible character evidence.

---

*See footnote page 268, *ante.*

[5]Contrary to the People's assertion, Walkey objected to the entirety of Dr. Chadwick's testimony, thereby preserving the issue for appeal. (See *People* v. *Bledsoe* (1984) 36 Cal.3d 236, 247 [203 Cal.Rptr. 450, 681 P.2d 291].)

## A.

Dr. Chadwick was the physician who had reviewed the photographs taken of Nathanel at the hospital and during the autopsy. Based on the number and types of bruises on Nathanel's body, Dr. Chadwick concluded Nathanel was a battered child. He also explained to the jury the various factors constituting the profile of a child abuser, stating the most important single factor is "having been abused oneself in infancy or childhood." Other factors, he explained, were social isolation, unreasonable expectations of young children (including toilet training at a very early age), and stress.

After Walkey testified on direct examination, a juror sent the court a note asking whether Walkey was an abused child. Walkey objected, under Evidence Code section 352, to the prosecution questioning him on this matter. The court overruled the objection, finding the probative value of this line of questioning outweighed its prejudicial effect.

The prosecutor was allowed to elicit from Walkey on cross-examination that when Walkey was a child, he was disciplined by being bitten and hit with a board. The prosecutor also asked Walkey whether he remembered telling Ellen Cosby that Walkey's stepfather used to take him out to the garage to beat him. Walkey denied telling this to Cosby. Following this testimony, the court refused Walkey's request to reopen the defense's case to have Walkey's stepfather testify he never took Walkey out to the garage to beat him. During closing argument, the prosecutor argued Walkey fit Dr. Chadwick's profile of a battering parent.[6]

---

[6]The prosecutor argued the following:

"We also know that Mr. Walkey was at least to some extent battered. Whether it was a board or a cord, we know that that was the sort of treatment that he received as he was growing up.

"Now, why is that important? Why is that something which is singled out and said, 'Uh-huh, look at this.' Remember the testimony of Dr. Chadwick? I asked him, 'Dr. Chadwick, is there a profile that helps us to identify people who are likely to abuse or who abuse children?'

"He said that is not a very good word for it. He said there are a number of factors that the experts in this field see again and again, and recognize as being factors. What were they?

"Maybe some of you wrote them down, something that will be of value to you, not just in this case, but in your life after this case.

"He said, and I quote, 'The most important single one is the fact of having been abused oneself in infancy or childhood.'

"Oh, we know that did not happen to Ellen Cosby. We know that did happen to Fred Walkey, and there were other factors not just that one. That is the single most important, but what are the others?

"Social isolation from the presence of others who are around to prevent it.

"Well, I suggest what that means is you have parents coming to visit, you have grandparents coming to visit, you are going here for Thanksgiving, here for Christmas, and you don't dare take that grandchild home with a bruise on its cheek to grandmother. That is a

## B.

■ No California court has considered the issue of the admissibility of "battering parent syndrome" evidence.[7] Other courts that have addressed the issue have disallowed evidence to show the defendant fit within the battering parent profile, reasoning character evidence in criminal cases may not be used to prove a defendant acted in conformity with such character. (See, e.g., *State* v. *Loebach* (Minn. 1981) 310 N.W.2d 58, 64; *Sanders* v. *State* (1983) 251 Ga. 70 [303 S.E.2d 13, 18]; *Duley* v. *State* (1983) 56 Md.App. 275 [467 A.2d 776, 780].)

"Such evidence invites a jury to conclude that because the defendant has been identified by an expert with experience in child abuse cases as a member of a group having a higher incidence of child . . . abuse, it is more likely the defendant committed the crime." (*State* v. *Maule* (1983) 35

---

social pressure, that keeps people who might abuse from doing it.

"I suggest that you don't take him to the base hospital at Camp Pendleton like Ellen Cosby did if you are the person who does the abusing.

"Unreasonable expectation was a factor that Dr. Chadwick mentioned, and specifically one of the unreasonable expectations, that this child at 25 months is going to learn to say, 'I have to go to the bathroom, take me now,' and not have any accidents. It is what this killing is all about, ladies and gentlemen.

"A child who had a toilet training accident, and the defendant decided that he was going to teach him that that was not something that he should do, and he didn't fly off the handle and just do it like that.

"He did it, he set out with a purpose of doing it, and he did it intentionally, premeditated, willful, deliberate.

" 'You are not going to do this again, and I am going to teach you not to do it.' Then that is what happened.

"What are the other factors that Dr. Chadwick talked about? He said a lot of other things going on that are impinging on one's life that causes frustration and anger.

"Did Mr. Walkey have a lot of other things going on in his life that caused frustration and anger?

"Yeah, he was U.A., unauthorized absence from the Marine Corps. They had declared him a deserter. He didn't think that was fair, but he knew they had done that. That was some pressure. That was some frustration. That was some anger.

"He is living under the same roof with his wife, sleeping with somebody else, yet his wife is there. Did that cause a little frustration? Caused a little anger? Were there disagreements about that?

"Miller told you about one. He said, 'I woke up in the middle of the night, and I heard this argument going on, and the next morning Alicia Walkey came down and asked me to take her to the hospital, and I said, "Did Fred do that," and she said, "No, I tripped over a toy." '

"Do you think she tripped over a toy? Fred Walkey fits the profile that Dr. Chadwick testified about."

[7]Battering parent syndrome represents a distinctly different concept from battered child syndrome. The latter has become an accepted medical diagnosis and expert testimony on the subject is admissible in child abuse prosecutions. (*People* v. *Jackson* (1971) 18 Cal.App.3d 504, 507 [95 Cal.Rptr. 919].) An expert testifying as to the existence of the battered child syndrome expresses no opinion on a defendant's culpability; rather, such evidence is most often used by the prosecution to preclude an inference of accident. (See *People* v. *Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299].)

Wash.App. 287 [667 P.2d 96, 99].) Thus, the nature and extent of the potential prejudice to a defendant generated by character evidence renders it inadmissible. (*Michelson* v. *United States* (1948) 335 U.S. 469, 475-476 [93 L.Ed. 168, 173-174, 69 S.Ct. 213].) We agree with those courts holding the prosecution may not introduce character evidence of a defendant to show the defendant has the characteristics of a typical battering parent.

## C.

Evidence Code section 1102 precludes evidence of specific acts of the defendant to prove character as circumstantial evidence of his disposition to commit the crime with which he is charged. (See *People* v. *Wagner* (1970) 13 Cal.3d 612, 618-619 [119 Cal.Rptr. 457, 532 P.2d 105].) The prosecution may not cross-examine the defendant as to specific matters in an attempt to prove bad character until and unless the defendant first puts in evidence of his good character. (*People* v. *Terry* (1970) 2 Cal.3d 362, 400 [85 Cal.Rptr. 409, 466 P.2d 961].) Here, Walkey did not put his character in evidence. The prosecution's obvious purpose in introducing battering parent evidence was to show Walkey fit within that profile. Although Dr. Chadwick never expressly concluded Walkey fit the profile, his testimony clearly implicated Walkey's character. Dr. Chadwick's testimony tended to associate Walkey with a group of persons who, in Dr. Chadwick's opinion, are often child abusers. This, coupled with Walkey's admission he was physically disciplined as a child and other testimony Walkey had certain characteristics typical of a battering parent,[8] impermissibly allowed the jury to infer Walkey was a battering parent and therefore must have caused Nathanel's injuries. Accordingly, the court erred in admitting that part of Dr. Chadwick's testimony used to prove Walkey fit the diagnosis of a battering parent.

## D.

The error in admitting battering parent testimony was, however, harmless. The prosecution's case against Walkey was strong. Nathanel's injuries were established as being nonaccidental. Walkey's testimony Nathanel received his injuries as a result of falling down the stairs or being knocked down by his dog is entirely inconsistent with the medical experts' testimony Nathanel's fatal injuries were caused by a severe blow to the abdomen with a blunt object. Walkey was with Nathanel during the hours

---

[8]The prosecution introduced evidence that a soiled diaper was found on the bathroom floor the day Nathanel died, implying Nathanel's beating was a result of a toilet training accident. Evidence of stress in Walkey's life was also presented, such as his unauthorized absence from the military and his living arrangement with both his wife and Cosby. Also, Cosby testified she was never abused as a child, thereby ruling her out as a typical battering parent.

these injuries were inflicted. Several witnesses saw Walkey carrying Nathanel, unconscious. Walkey admitted disciplining Nathanel by biting him and the bite marks on Nathanel's body were consistent with the dental impressions taken of Walkey. Thus, it is not reasonably probable a result more favorable to Walkey would have resulted absent the improper testimony.[9] (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see also *People* v. *Bledsoe, supra*, 36 Cal.3d at p. 252.)

IV*

. . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is modified by reducing the degree of Walkey's murder conviction to second degree murder, and as so modified, is affirmed. The matter is remanded to the trial court with directions to sentence Walkey for the time prescribed by law for second degree murder.

Kremer, P. J., and Lewis, J., concurred.

---

[9]By this, we mean reversal is not required in light of our modifying Walkey's conviction to second degree murder. In other words, absent the error, Walkey would not have achieved a result more favorable than second degree murder.

*See footnote page 268, *ante*.