[No. B014954. Second Dist., Div. Four. Sept. 9, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN EARL HINDMARSH, Defendant and Appellant.

**COUNSEL**

Joseph F. Walsh, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ARGUELLES, J.—Kevin Hindmarsh appeals from his conviction after jury trial of two counts of first degree murder (Pen. Code, § 187) and two counts of genital penetration by a foreign object (Pen. Code, § 289) with allegations as to use of a deadly and dangerous weapon found true.

### FACTS

■ Under the applicable standards of review, we discern the following facts based on the evidence most favorable to the judgment. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738].)

On May 10, 1984, one of the two victims, Neda O'Sullivan, then 11 years old, and her 16-year-old sister, Audrey, lived with their mother at a condominium in Miraleste. The mother left for work early that morning, and her daughters went to school. Before the girls left for school, however, Neda gave her sister a note that she had received the day before, later determined to have been written by appellant, that read: "Audrey, stay home tomorrow. I will be by at 9:00." Audrey had met appellant at a bus stop near her home about a week before Easter vacation and had seen him there on four subsequent occasions, the last of which was on May 7. At that time, he told Audrey to stay home from school and meet him at her home the following Monday, May 10. Instead, Neda and Audrey proceeded to school.

Between 11 a.m. and noon that same day, a security guard at the condominium complex where the O'Sullivans resided saw appellant walk up to the guardhouse and then towards the O'Sullivan residence. The guard surreptitiously followed appellant and saw him walk to the O'Sullivan's front door, put his ear to the door, and then walk to the window to peer inside. Appellant then proceeded towards the back of the garages, and the guard saw him climbing up towards the roof. At that point, the guard told him to get down off the roof. Appellant climbed down. The guard asked appellant what he was doing, and appellant responded that he was there to see one of his friends, Audrey O'Sullivan, and he gave the guard a physical description of her. The guard told appellant that he would call the sheriff if he saw him climbing on the roof again. Appellant said, "okay," and then

appeared to leave. However, the guard saw appellant again about 3 p.m. walking toward the O'Sullivan residence wearing blue jeans and a blue hooded sweat jacket. The guard did not see appellant again for he was summoned by a burglar alarm about 10 minutes later. The guard later identified appellant in a police live lineup.

A mail carrier also saw appellant at the condominium complex at about noon. The mail carrier also identified appellant at a police lineup.

Later that same afternoon, about 3:55 p.m., another security guard at a nearby condominium complex saw appellant walk by. He knew appellant, and the two exchanged greetings. About 15 minutes later, the guard heard emergency vehicle sirens at the O'Sullivan condominium complex.

A 14-year-old resident of the O'Sullivan condominium complex was standing near the swimming pool in the complex about 3 p.m. when he saw appellant walk in his direction and then turn on the sidewalk in front of the O'Sullivan residence.

At 2:19 p.m., the victims, Neda O'Sullivan and 11-year-old Kristen Mac Knight left their last class of the day together.

Audrey O'Sullivan left school about 2:43 p.m. that day, arriving home shortly before 4 p.m. When she opened the door to the O'Sullivan residence she saw Neda, who appeared to be dead, and Kristen Mac Knight lying on the floor near the door. She called the police and ran outside to meet them.

Sheriff's deputies arrived within minutes, followed by fire department personnel. Kristen Mac Knight had a blue tee-shirt stuffed in her mouth but showed some signs of life. She was taken to the hospital, where she died. Neda O'Sullivan appeared to be dead. Her pants were pulled down so as to expose her pubic area.

Although Neda O'Sullivan's mother kept a pair of yellow gloves and a hammer under the kitchen sink, the hammer was found on a living room table and the gloves, turned inside out, were found on a walkway outside the condominium after sheriff's deputies arrived.

A maintenance man at the O'Sullivan condominium complex went into the men's bathroom at the swimming pool about 8:30 a.m. on May 11, and observed what looked like blood splattered on the wall. He had last been in there about 2 p.m. the previous day but had not noticed it then. A sheriff's department criminalist came out and took some samples of the substance back to the crime lab.

Other blood samples were taken from appellant's tennis shoes and socks, from the hammer found on a coffee table inside the O'Sullivan residence next to a glass tumbler, and from the rubber gloves found outside the residence. The blood from one of appellant's socks was human blood, and the blood stains from the hammer and gloves were consistent with Kristen Mac Knight's blood type.

A fingerprint lifted from a glass inside the O'Sullivan residence matched one of appellant's fingerprints. In one of his statements to sheriff's deputies, appellant had denied ever being at the O'Sullivan residence.

The coroner's office pathologist who conducted autopsies on the victims found that Kristen Mac Knight's death was caused by multiple trauma to the head. That trauma and the other injuries he found consisted of the following: 21 separate head injuries consisting of lacerations and depressed fractures; one stab wound in the head; bruises on the back of the shoulders and thighs; and a small laceration over the dilated anus suggestive of sodomy or similar penetration.

He found that Neda O'Sullivan's death was caused by multiple trauma, primarily to the head. Her injuries consisted of the following: nine separate head injuries consisting of lacerations and fractures; a ligature mark on the neck suggestive of strangulation; two large antemortem burn areas on the left side of the neck and upper left shoulder area; and trauma and dilation of the anus suggestive of sodomy. In his opinion, the head trauma to both victims was probably caused by the head and claw ends of a hammer.

## CONTENTIONS

Appellant raises the following contentions on appeal: I. The trial court reversibly erred in denying appellant's motion to suppress his tape-recorded postarrest statement, his tennis shoes and prearrest statements concerning them in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]; II. There was insufficient evidence to convict appellant of first degree murder on a torture-murder theory, "and both murder convictions should be reduced to second degree murder"; III. "The court erred in failing to instruct on the lesser included offense of second degree murder"; and IV. There was insufficient evidence to convict appellant of any of the charged crimes.

## DISCUSSION

### I. *Suppression of Evidence*

#### A. *Appellant's Tape-recorded Statement*

■ In his own words, "Appellant urges reversal of his convictions on the grounds that the trial court failed to suppress his tape-recorded post-

arrest statement," which he contends "was obtained in violation of" *Miranda* v. *Arizona, supra,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. In support of his argument, appellant relies primarily on our Supreme Court's decisions in *People* v. *Rivera* (1985) 41 Cal.3d 388 [221 Cal.Rptr. 562, 710 P.2d 362], and *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793].

In those two decisions, the state high court held that "'when, as in the instant case, a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, *must, in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege.* The police must cease custodial interrogation immediately upon exercise of the privilege. . . .'" (*People* v. *Rivera, supra,* 41 Cal.3d 388, 394, quoting *People* v. *Burton, supra,* 6 Cal.3d 375, 383-384.)

That suggested procedure is precisely what happened here.

The statement appellant refers to was made about 10:40 p.m. on May 10, 1984, at the Lomita sheriff's station. The transcript of that tape-recorded statement was introduced into evidence at trial and read, in part, as follows:

"Q. BY SERGEANT HORTON: —OF LOMITA STATION.

"OKAY, KEVIN, I'M GOING TO READ YOU YOUR RIGHTS AND THEN I WANT YOU TO READ THEM AND MAKE SURE YOU UNDERSTAND THEM, OKAY? FIRST OF ALL: 'YOU HAVE THE RIGHT TO REMAIN SILENT. ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF A LAW. YOU HAVE THE RIGHT TO TALK TO A LAWYER BEFORE WE TALK TO YOU AND TO HAVE HIM PRESENT WHILE WE TALK TO YOU. IF YOU CANNOT AFFORD TO HIRE A LAWYER, ONE WILL BE APPOINTED TO REPRESENT YOU BEFORE ANY QUESTIONING, FREE OF CHARGE.'

"DO YOU UNDERSTAND EACH OF THESE RIGHTS I'VE EXPLAINED TO YOU?

"A. YES.

"Q. DO YOU WANT TO TALK ABOUT THIS CASE OR NOT?

"A. I'D LIKE TO HAVE MY PARENT—I'D LIKE TO TALK TO MY PARENTS BEFORE I—

"Q. OKAY.

"A. —Say Anything.

"Q. Do You Want—Have Both of Your Parents Here?

"A. I'd Like to Talk to My Parents (Unintelligible).

"Q. Okay.

"A. (Unintelligible.)

"Q. Do You Want a Lawyer Right Now or Not?

"A. I'd Like to Talk to My Parents.

"Q. You Want to Talk to Them First.

"Okay, Now, I'll Read This Statement to You—It's—It's a Waiver. It Says, I Have Read This Statement of My Rights or I Have Been Informed Orally of My Rights and I Understand What My Rights Are.

"Do You Understand What Your Rights Are at This Point, Right? Answer.

"A. Yes.

"Q. Yes, Okay. Okay, It Goes on to State, I Do Not Want a Lawyer Which We'll—You Stated You Want Your Parents Which We'll Bring Them in. I Understand and Know What I Am Doing and No Promises or Threats Have Been Made to Me and No Pressure or Coercion of any Kind Has Been Used Against Me.

"Okay. Assuming After You Talk to Your Parents You Want to Talk to the—Talk to Us, Then I'll Have You Sign This and Date It, Okay?

"We're Going to Shut the Tape Off Now and We're Going to Get Your Parents and Bring Them Down.

"A. Okay.

"Q. The Time Is Now 2318 Hours. We're Again Talking to Kevin Hindmarsh. At His Request, His Parents, Mr. and Mrs. Hindmarsh Are Present.

"KEVIN, YOU KNOW I—I ADVISED YOU OF YOUR RIGHTS EARLIER AND YOU REQUESTED YOUR PARENTS TO BE HERE.

"NOW LET ME READ YOU AGAIN:

"'YOU HAVE A RIGHT TO REMAIN SILENT. ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW. YOU HAVE THE RIGHT TO A LAWYER BEFORE WE TALK TO YOU AND TO HAVE HIM PRESENT WHILE WE TALK TO YOU. IF YOU CANNOT AFFORD TO HIRE A LAWYER, ONE WILL BE APPOINTED TO REPRESENT YOU BEFORE ANY QUESTIONING FREE OF CHARGE.'

"DO YOU UNDERSTAND EACH OF THESE RIGHTS EXPLAINED TO YOU?

"A. YES.

"Q. DO YOU WANT TO TALK ABOUT THIS CASE OR NOT?

"A. YES.

"Q. OKAY. DO YOU WANT A LAWYER OR NOT?

"A. NO.

"Q. OKAY. I'M GOING TO HAVE YOU READ THIS, KEVIN, AND THEN ASK YOU TO SIGN IT. OKAY. AND THE DATE IS 5/10 AND THE TIME IS 11:20 P.M.

"MR. AND MRS. HINDMARSH, WOULD YOU LIKE TO SIGN THIS AS A WITNESS?

"OKAY. THANK YOU VERY MUCH.

"OKAY. KEVIN, WOULD YOU LIKE TO TELL US WHAT YOU DID TODAY?"

Thus, the record affirmatively demonstrates that appellant's request to talk with his parents was respected and that questioning was duly terminated at that point. After appellant had the opportunity to speak with his parents, and was readvised of and expressly waived his constitutional rights, questioning resumed in his parents' presence, again pursuant to appellant's request. Resumption of questioning under such circumstances was proper and was not a violation of appellant's constitutional rights. For that reason, appellant's further argument that his trial counsel's failure to object to that tape-recorded statement at trial constituted ineffective assistance of counsel

lacks merit. ■ Accordingly, we further find that appellant's failure to object to admission of the tape-recorded statement at trial must be deemed a waiver of the alleged error on appeal. (*In re Dennis M.* (1969) 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296]; *People* v. *Watson* (1977) 75 Cal.App.3d 384, 394 [142 Cal.Rptr. 134].)

### B. *Appellant's Tennis Shoes and Related Statements*

■ Appellant also argues that the trial court erred prejudicially in refusing to grant his motion to suppress "evidence of the discovery of appellant's shoes and of statements appellant made at his residence" before his arrest. Examination of the record discloses this argument's lack of merit.

Appellant's argument is based on the fact that when investigating sheriff's detectives first contacted appellant at his home on the afternoon of the killings, and advised him of his constitutional rights, they did not obtain from appellant an *express* waiver of those rights. Instead, Deputy Biscan asked appellant if they could search his room to which appellant responded that they could but requested them to wait until his mother arrived home. Deputy Biscan advised appellant of his right to refuse consent to search and of the fact that the deputies had no search warrant, as well as the fact that anything they found could be used as evidence against appellant in court. Appellant said that he understood. The deputies waited for appellant's mother to arrive home at which time both appellant and his mother expressly gave their consent for the deputies to search appellant's room. The search revealed the laceless, wet tennis shoes that were later found to contain traces of human blood.

When the deputies found the shoes, they asked appellant, who was standing in the doorway, if he had worn the shoes that day, why they were wet, and where the shoelaces were. The shoes and appellant's responses to the deputies' questions were sought to be introduced as evidence at trial against appellant. Appellant's counsel moved to suppress the evidence of appellant's shoes and his statements concerning them on the grounds that appellant had not expressly waived his constitutional rights.

Appellant properly recites the applicable rule that the absence of an express waiver does not in itself establish the right to remain silent and right to counsel. (*People* v. *Davis* (1981) 29 Cal.3d 814, 824 [176 Cal.Rptr. 521, 633 P.2d 186]; *North Carolina* v. *Butler* (1979) 441 U.S. 369, 375-376 [60 L.Ed.2d 286, 293-294, 99 S.Ct. 1755].) Nevertheless, appellant argues that law enforcement officers should be required to obtain express waivers when they are dealing with a minor.

In *People* v. *Davis, supra,* 29 Cal.3d 814, 824, our Supreme Court discussed this issue and found that, "Despite our sensitivity to the youth and inexperience of defendant, on an independent examination of the record (see *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74]) we conclude the trial court did not err [in concluding that defendant had not asserted his right to remain silent]." The court held that, "Although the preferable practice is to seek the consent of a responsible adult before questioning a minor (*People* v. *Lara* [(1967)] 67 Cal.2d [365] at pp. 378-379 [62 Cal.Rptr. 586, 432 P.2d 202]), the failure to do so under the circumstances . . . did not render defendant's statement involuntary." (*People* v. *Davis, supra,* 29 Cal.3d at p. 826.) The court based its conclusion, in large part, on the fact that, "[t]he evidence tended to show that he was fully aware of his rights, and was not frightened into submission by the officers' behavior" and, further, that defendant "was attempting to use the situation to his own advantage by pretending to cooperate fully and by forthrightly admitting his contact with the victim on the evening of her death to bolster his credibility in asserting his innocence." (*Id.*, at p. 825.)

Similarly, in the instant case, appellant was not unsophisticated in dealing with law enforcement officers. When the plainclothes sheriff's deputies introduced and identified themselves to appellant, he responded, "I knew who you were," because, he said, he heard the radio broadcast from the unmarked detective car parked in front of his house. When the deputies began to advise appellant of his constitutional rights, appellant interjected, "I know my rights. I have taken the students [*sic*] of the law." A short time later, in responding to the deputies' questions about the wet tennis shoes, appellant used the situation to his own advantage by attempting to set up an alibi, explaining to the deputies that he had been at the nearby Stoneridge condominium complex swimming pool earlier in the afternoon, that he had placed his tennis shoes on top of a pole near the pool, that a 10-year-old boy in the pool had splashed water on his shoes, and that, while he was walking home, he stopped to tie his shoelaces, which broke, and which he then threw into some nearby bushes, though he could not recall exactly where the bushes were.

Therefore, we are satisfied that appellant's statements were not involuntary and that he did not assert his right to remain silent; accordingly, the trial court did not err in denying appellant's motion to suppress under the circumstances presented here.

## II. *Substantial Evidence of Torture Murder*

Appellant contends that both first degree murder convictions should be reduced to second degree murder because of insufficient evidence of torture murder.

The only homicide theories on which the jury was instructed were first degree murder by either torture murder or felony murder. By special findings in its verdict, the jury rejected the felony-murder theory of killings during the commission of "any one or more of the following: [¶] (A) ROBBERY [¶] (B) BURGLARY [¶] (C) LEWD ACT WITH A CHILD UNDER THE AGE OF 14." The jury found appellant guilty of torture murder.

"Penal Code section 189 makes a murder which is perpetrated by means of torture a murder of the first degree. ▪▪▪ The essential elements of the crime are: "'. . . (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose.'" (*People* v. *Wiley* [(1976)] 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881].) The defendant need not have an intent to kill the victim—the malice element of murder may be supplied by an intentional act involving a high degree of probability of death which is committed with conscious disregard for human life. [Citations.] . . ." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861].)

"It is thus apparent that the intent to inflict torturous pain and suffering on the victim is at the heart of the crime of first degree murder perpetrated by torture." (*Id.,* at p. 268.)

▪▪▪ In support of his contention, appellant argues that evidence of intent to cause cruel pain and suffering was insufficient. Specifically, he argues that the intent to torture "cannot be inferred solely from the condition of the victim's body or from the mode of assault or injury suffered," but that other evidence not produced at trial was required to show an intent to cause suffering. This argument both misstates the applicable law and ignores significant evidence, aside from the victims' injuries, presented at trial.

▪▪▪ The Supreme Court has instructed that "the severity of the injury may provide the basis for an inference that the killer harbored the required intent to torture," even though such a conclusion is not compelled and "the nature of the victim's wounds is not determinative." (*People* v. *Davenport, supra,* 41 Cal.3d at p. 268.) ▪▪▪ Examples of torture-murder convictions that have been reversed despite the extreme gruesomeness of the crimes include "where the evidence showed that the killing resulted from 'an explosion of violence' or 'an act of animal fury produced when inhibitions were removed by alcohol.' [Citations.]" (*Ibid.*)

Although appellant asserts that the killings here also resulted from "'an explosion of violence' or 'an act of animal fury produced when inhibitions

were removed by alcohol,'" the evidence does not support appellant's assertions. Appellant cites no evidence suggesting his intoxication, an explosion of violence or animal fury. We share the view of the reviewing court in *People* v. *Demond* (1976) 59 Cal.App.3d 574, 585 [130 Cal.Rptr. 590], which, when confronted with the same contention as appellant raises here on a record similar to the one before us, observed: ". . . There is no showing of any circumstance, such as use of drugs or alcohol, which would diminish his capacity to premeditate and deliberate. (*People* v. *Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Tubby* (1949) 34 Cal.2d 72 [207 P.2d 51].) There was no showing that his intellectual capacity was impaired or that he was subject to misconduct because he was carried away by the heat of passion. (*People* v. *Steger* [(1976)] 16 Cal.3d 539 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].)"

In arguing that the evidence here was insufficient to support the torture-murder convictions, appellant relies on *People* v. *Steger* (1976) 16 Cal.3d 539 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]. In *Steger* the three-year-old victim died from severe injuries inflicted by her stepmother over a one-month period that included, in addition to cuts and bruises from head to toe, a hemorrhaged liver, adrenal gland, intestines and diaphragm, as well as a lacerated chin and fractured checkbone and forearm. The court held that the first degree murder conviction on a torture-murder theory was not supported by substantial evidence and that the trial court had erred in instructing the jury on torture murder. (At pp. 548-549.) In particular, the court found that the People's evidence painted the defendant stepmother "as a tormented woman, continually frustrated by her inability to control her stepchild's behavior." (*Id.*, at p. 548.) On the basis of such evidence, the court concluded that, "The beatings were a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a criminal sense wilful, deliberate, or premeditated." (*Ibid.*; cf. *People* v. *Demond, supra,* 59 Cal.App.3d 574.)

The same cannot be said here. No existing relationship existed between appellant and his young victims that permitted him to punish or discipline them, and no evidence suggested that appellant was a "tormented" or "frustrated" person by virtue of any relationship to his victims.

*People* v. *Walkey* (1986) 177 Cal.App.3d 268 [223 Cal.Rptr. 132], a recent decision following *Steger* in concluding that the evidence was insufficient to support a torture-murder conviction of the defendant for the fatal beating he administered on the two-year-old child he was supervising, is likewise distinguishable from the facts presented here. In *Walkey,* the court found that the record indicated defendant may have become frustrated and angry with the child and intended to punish him but dispelled any

hypothesis that defendant's primary purpose was to cause the child to suffer. (At p. 276.)

We find that the evidence here supports a conclusion contrary to that reached in *Steger* and *Walkey* for there was no evidence of any arguably legitimate purpose for the brutal and painful injuries inflicted upon the victims. We note further that, unlike both *Steger* and *Walkey,* more than one victim was involved here. The evidence suggested that appellant may well have forcefully penetrated the anus of each victim with a foreign object while the other looked on and clearly showed that he administered the large burn with an open flame to Neda O'Sullivan's neck and left shoulder area, and choked her, while Kristen Mac Knight was still alive. Also, the 30 hammer blows he collectively inflicted upon the two victims' heads with sufficient force to cause multiple skull fractures could not have been administered simultaneously. The sheer number of blows strongly suggests appellant switched back and forth between the two victims to initially silence and disable and ultimately cause death. Given the testimony that these hammer blows contributed most significantly to the victims' deaths and that the burn injury, attempted strangulation, and anal trauma were administered before death, the most obvious and reasonable interpretation of the evidence is that the painful burn, attempted strangulation, and anal penetration preceded the fatal hammer blows. That being so, and given the sexual aspect of anally penetrating the young female victims, as well as burning the one who was the younger sister of the girl who apparently rebuffed appellant, the jury could reasonably and easily have inferred appellant's intent to inflict "cruel pain and suffering" on the girls for a vengeful or sadistic purpose. The jury could have well concluded from the physical evidence that any possible initial "frenzied" acts by appellant changed during the process of the killings into sadism. Indeed, no other reasonable interpretation of the evidence is suggested.

Any suggestion that appellant's intentionally torturous acts may not have been deliberate and premeditated is squelched by the evidence indicating that appellant had removed the pair of yellow rubber gloves and the hammer from underneath the O'Sullivan's kitchen sink, which were later found to be bloodstained, together with evidence that the head injuries to both victims were produced by multiple severe blows with a blunt and clawed hammer-like instrument. "'. . . A murder by torture was and is considered among the most reprehensible types of murder *because of the calculated nature of the acts causing death,* not simply because greater culpability could be attached to murder in which great pain and suffering are caused to the victim. [Citation.]'" (*People* v. *Davenport, supra,* 41 Cal.3d at p. 267, quoting *People* v. *Wiley* (1976) 18 Cal.3d 162, 168-169 [133 Cal.Rptr. 135, 554 P.2d 881].)

We must conclude, therefore, that unlike the "explosion[s] of violence" by the defendants in *Steger* and *Walkey* against their single victims, appellant's heinous acts inflicted upon the two young girls here were the products of vengeful or sadistic calculation.

Appellant's refutation that no evidence demonstrated the required "causal relationship between the torturous act and the victim's death" (*People* v. *Davenport, supra,* 41 Cal.3d at p. 267; *People* v. *Wiley, supra,* 18 Cal.3d 162, 168) is little more than legal gossamer. Appellant isolates certain of the injuries to the victims, such as the anal trauma and the burns to Neda O'Sullivan's neck and shoulder, in arguing that the only torturous acts were nonlethal and, therefore, not properly a basis for a torture-murder conviction.

First, we disagree with appellant's implicit presumption that the repeated blows to the heads of both victims with the blunt and clawed ends of a hammer could not be considered torturous, that is, not inflicted to cause cruel pain and suffering. Second, in our view, the legal requirement is not that each separately identifiable injury must cause the victim's death; rather, it is that the "torturous act" bear a "causal relationship" to the victim's death. Under the particular circumstances presented here, we find that the jury properly may have concluded that the "torturous act" consisted of a combination of different painful injuries inflicted in the course of a single plan or scheme calculated to cause cruel pain and suffering culminating in death. Thus, each separate, pain-producing injury, though not necessarily fatal itself, was causally related to each victim's death.

Accordingly, we conclude that the conviction of first degree murder by torture was supported by substantial evidence.

III. *Instruction on Lesser Included Offense*

Appellant next argues that the trial court reversibly erred by failing to instruct the jury on the lesser included offense of second degree murder. After considering the evidence adduced at trial, we have concluded that an instruction on second degree murder was not required.

"It is well settled that the trial court is obligated to instruct on necessarily included offenses—even without a request—when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. [Citations.]" (*People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].) No such obligation to instruct arises, however, "when there is no evidence that the offense was less than

that charged." (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311].) The evidence must be examined to see whether there is substantial evidence which could support a conviction of the lesser offense or whether the lesser offense is inconsistent with defendant's theory of the case. (*Id.*, at p. 326.)

In *People* v. *Wickersham, supra,* 32 Cal.3d 307, the court repeated its disapproval, announced in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1], of the idea that jury instructions "'. . . must be given whenever *any* evidence is presented, no matter how weak,'" which would support a finding of a lesser offense. Although the trial court is not permitted to weigh credibility in making this determination, it need not "present theories to the jury which the jury could not reasonably find to exist." (*People* v. *Wickersham, supra,* 32 Cal.3d at pp. 324-325.)

We have reviewed the evidence and concluded that the trial court was correct in determining that an instruction on second degree murder was not required. All of the evidence presented to the jury could lead only to the conclusion that if appellant killed the victims, it was "'"'. . . with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose.'"' [Citation.]" (*People* v. *Davenport, supra,* 41 Cal.3d at p. 267.)

We note that the jury having expressly rejected a finding of first degree felony murder under the circumstances presented by the evidence here, a finding of second degree murder not based on felony murder would have been inconsistent with the finding of first degree torture murder actually made by the jury. First, intent to kill is not an essential element of first degree torture murder (*People* v. *Steger, supra,* 16 Cal.3d 539, 546; *People* v. *Mattison* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193]; CALJIC No. 8.24), but it is an element of second degree murder (CALJIC No. 8.30; see *People* v. *Wickersham, supra,* 32 Cal.3d 307, 329). Second, deliberation and premeditation are required elements of torture murder (*People* v. *Steger, supra,* 16 Cal.3d at p. 546) but not of second degree murder (CALJIC No. 8.30; see *People* v. *Wickersham, supra,* 32 Cal.3d at p. 329). Third, the prosecutor did not argue that appellant had an intent to kill because, apparently, no evidence supported that argument relative to the torture-murder theory. Therefore, no theory of the evidence would have supported a second degree murder conviction even if there had been insufficient evidence of a willful, deliberate and premeditated intent to inflict extreme pain and suffering on the victims because no evidence supported a finding of the necessary element of intent to kill.

Moreover, evidence that the hammer and rubber gloves that were ordinarily kept under the O'Sullivan's kitchen sink were used in the killings

irrefutably supported the jury's conclusion that appellant's torturous acts were deliberate and premeditated, and that evidence would have had to be ignored by the jury in order for them to reach a contrary conclusion.

Finally, we note that appellant's defense was solely the People's failure to meet its burden of proof, so that no theory of the evidence relative to premeditation and deliberation, or of any other necessary elements of the charged offenses, was offered by appellant that would have supported an instruction on second degree murder.

## IV. *Substantial Evidence That Appellant Was Perpetrator*

■ Appellant's remaining contention is that the evidence that he was the perpetrator of any of the charged offenses was insufficient to warrant a conviction. Our previous recitation of the facts established or reasonably inferred from the evidence leaves no reasonable doubt that appellant was the perpetrator of the charged crimes. The blood traces found inside appellant's tennis shoes and on his sock, appellant's fingerprint found on a glass inside the O'Sullivan residence when he claimed he had never been there, the handwritten note, following a similar personal request just three days before the murders asking Audrey O'Sullivan to meet appellant on the day of the murders at her residence, and the numerous eyewitnesses who saw appellant skulking around the O'Sullivan residence at various times on the day of the murders, including a guard who testified that appellant told him he had come to the condominium complex to visit his friend, Audrey O'Sullivan—all constituted persuasive circumstantial evidence linking appellant with the crimes.

Suffice it to say that our review of the record convinces us that substantial evidence supported the finding that appellant was the perpetrator of the crimes of which he was convicted.

### DISPOSITION

The judgment is affirmed.

Kingsley, Acting P. J., and McClosky, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 26, 1986.