52 Cal.Rptr.3d 427 (2006)
145 Cal.App.4th 1002
The PEOPLE, Plaintiff and Respondent,
v.
Marlon BRANDON, Defendant and Appellant.
No. B186361.
Court of Appeal of California, Second District, Division Five.
December 15, 2006.
As Modified December 20, 2006.
*430 Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Ana R. Duarte, and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
TURNER, P.J.

I. INTRODUCTION
Defendant, Marlon Brandon, appeals from his convictions for: three counts of pimping (Pen.Code,[1] § 266h, subd. (a)); four counts of pandering by procuring (§ 266i, subd. (a)(1)); attempted pandering by procuring (§§ 266i, subd. (a)(1), 664); three counts of false imprisonment by violence (§ 236); forcible rape (§ 261, subd. (a)(2)); aggravated sexual assault of a child (§§ 261, subd. (a)(2), 269, (a)(1)); forcible lewd act upon a child (§ 288, subd. (b)(1)); lewd act upon a child (§ 288, subd. (a)); aggravated sexual assault of a child, oral copulation (§§ 269, subd. (a)(4); 288a); forcible oral copulation (§ 288, subd. (c)(2)); and two counts of procuring a child to engage in a lewd act. (§ 266j.) The jury further found defendant personally used a *431 dangerous and deadly weapon in the false imprisonment by violence offense against Mamie D. Defendant argues: Mamie, a victim, was improperly permitted to testify with her face partially covered; opinion testimony concerning pimping strategies was erroneously presented to the jury; he was denied effective assistance of counsel; there was insufficient evidence to support his false imprisonment conviction; and various sentences must be stayed pursuant to section 654, subdivision (a). We agree that the felony false imprisonment sentence resulting from an attempt to pander Kaleena R. (counts 5 and 22 respectively) must be stayed pursuant to section 654, subdivision (a).

II. FACTUAL BACKGROUND

A. Kaleena (Counts 5 And 22)
We view the evidence in a light most favorable to the judgment. (Jackson v. Virginia (1979) 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560; People v. Elliot (2005) 37 Cal.4th 453, 466, 35 Cal.Rptr.3d 759, 122 P.3d 968; People v. Osband (1996) 13 Cal.4th 622, 690, 55 Cal.Rptr.2d 26, 919 P.2d 640; Taylor v. Stainer (9th Cir.1994) 31 F.3d 907, 908-909.) Kaleena worked as a prostitute on Figueroa Street in Los Angeles. On November 14, 2002, Kaleena was attempting to avoid contact with Officer Rene Minnick, who often arrested prostitutes. Also, Kaleena was hoping to avoid pimps who might "hassle" her to work for them. Kaleena took the side streets to a nearby MacDonald's restaurant.
A man who Kaleena had previously seen on Hollywood Boulevard began following her in a black truck. Kaleena saw defendant sitting on a porch in front of a nearby house. Defendant quickly approached Kaleena and got close to her face. Kaleena was aware of a "rule on the streets" that a prostitute should not look a pimp, other than her own, in the eye. To do so could result in that pimp taking the prostitute's money. Kaleena attempted to turn to walk away. However, defendant placed his arms around her from behind, trapping her between himself and the gate to his house. Defendant asked Kaleena who was her pimp. Kaleena pointed to the name tattooed on her calf. Defendant identified himself at "Mac-Bone" or "Bob." Kaleena saw the man in the truck again. Kaleena told defendant, "`That's the guy right there that was harassing me.'" Defendant said, "`That's my cousin; he's not going to bother you while you standing here talking to me.'" Defendant's mother came outside and said, "`I like her.'" Defendant said Kaleena resembled his "Ho" named "Cherry."
Defendant told Kaleena that he wanted her to be on his "starting lineup." Kaleena understood this to mean that she would be one of the first set of prostitutes who control the rest of the women who work for him. Defendant said he had prostitutes in Florida and several places from which she could choose to work. Defendant told Kaleena she could get into either a green Cadillac or the black Cadillac Escalade parked nearby. Defendant told Kaleena that either way she was going to get into one Cadillac or another. Defendant told her, "We could do this the easy way by you going into the car; or, we could do this the hard way." Kaleena understood that to mean that defendant was going to take her against her will. Kaleena did not want to get into either car. Kaleena, who did not feel free to leave, was afraid because she had heard stories from other prostitutes. Kaleena saw Officer Minnick pull up in a police car. Kaleena stared at Officer Minnick. Kaleena stared in an attempt to communicate that she needed help. Defendant's mother wrote down a number on a piece of paper and gave it to *432 Kaleena. Defendant told her it was his phone number and she should use it. Kaleena understood it to mean that she should call him when she was ready to "Ho" for him. A prostitute is not allowed to work for more than one pimp at a time. The pimp she worked for had placed the tattoo on her leg.
Officer Minnick saw defendant confining Kaleena. Defendant had his arms around Kaleena. Defendant's hands were clutching the chain link fence. Officer Minnick also saw a black Cadillac Escalade truck illegally parked at the sidewalk over the crosswalk with the passenger door open. Officer Minnick made eye contact with Kaleena. Thereupon, Kaleena stared at Officer Minnick and then looked away. In the meantime, someone moved the black truck and parked it on the other side of the street. A black female got out of the truck and walked over to where Kaleena and defendant were standing. Defendant later let go of the fence. Kaleena immediately walked over to Officer Minnick's police car. Kaleena asked Officer Minnick to fake an arrest. As Kaleena spoke to Officer Minnick, defendant's mother approached from behind with a dog. Officer Minnick asked other officers who had arrived to detain Kaleena. Kaleena explained she did not want it to look like she was "telling." This is because if a prostitute "tells" on a pimp, she can be beaten or killed. Kaleena asked to be taken to the police station because she was afraid to talk to Officer Minnick in the presence of others. All of the foregoing interactions between defendant and Kaleena occurred on a single occasion.
Two officers questioned Kaleena at the police station. Kaleena told them what had occurred and gave them the paper with the phone number. Kaleena was afraid when defendant told her she could do it the easy or the hard way because he could react violently if she made him angry. Kaleena believed defendant might put her in the car against her will. Kaleena understood "`The Game'" to mean: "[Y]ou're set with a pimp and you can't get out of line with any other pimp. That means no eye contact, no conversation, nothing. You have toyou have to stay truthful to your pimp. You can't get out of line with no other pimp." Kaleena knew that if a prostitute gets "out of line," she may be beaten by her pimp. According to Kaleena, "word get[s]" around on the street if a prostitute speaks to another pimp.

B. Elisha G. (Counts 11, 12, 13, 14, 15, 16, And 21)
Elisha was born in October 1987. Elisha had lied about her age to police while working as a prostitute. Elisha used the name Monica E. when she talked to the police. Elisha acknowledged she told Detective Keith Haight that in November 1998, when she was 11 years old, she met defendant at a Greyhound bus station in San Bernardino. When she was subpoenaed to testify against defendant, Elisha fought with jail personnel and lay down on the floor to avoid having to testify against defendant. Elisha did not recall previously stating that defendant: took her to Los Angeles; asked her out on a date; told her she was pretty and attractive; met her at an auto body shop near her house; showed her pictures of girls dressed in shortshorts and stilettos; asked her if she would like to look like the girls in the photos; told her if she stayed with him she could look like the girls in the photos; told her that her parents did not care about her and she should go with him; and told her he would buy her clothes. In court, Elisha testified, "I went with him on my own free will; he didn't force me to do anything."
*433 Further, Elisha did not remember stating that: defendant took her to a motel room, where he told her that he was a pimp and the girls in the photos were his whores; while in the motel room defendant asked her if she would "whore" for him; and defendant allowed her to call her parents from his cell phone and, when they did not answer, he said, "`See, if they were worried they would have answered the phone[.]'" Elisha did not remember ever stating: she finally agreed to be defendant's prostitute; defendant told her never take less than $50 for "head"; defendant explained that "head" meant oral copulation or sex; defendant told her the customer should touch her first on her breasts or crotch; defendant also said she should fondle the penis of a customer to determine if he is a police officer; defendant said if she was going to a hotel room with a customer, she should call him first; defendant said that she should bring the money back to him immediately after having sex; and defendant promised to take care of her and reward her with pretty clothes if she did all of these things.
Detective Haight interviewed Elisha at the Los Angeles County Juvenile Hall in October and November 2003. Elisha told Detective Haight that defendant, whom she knew as "Mac-Bone," was her pimp. Elisha said she met defendant at a bus station in San Bernardino in November 1998 when she was 11 years old. Defendant approached Elisha. Defendant told Elisha she was pretty. Defendant repeatedly asked Elisha for her phone number until she gave it to him. Defendant asked Elisha how old she was. Elisha told defendant that she was 11 years old. Defendant said he would call her and they would go on a date. Defendant told Elisha they could not meet at her house. Defendant later called Elisha and met her at an auto body shop near her home. Defendant showed her photos of provocatively dressed girls. Defendant told Elisha that if she wanted to look like the girls in the photos, he could buy her things and take her places. Defendant told Elisha that she could stay with him. Defendant told Elisha that her parents did not care for her but he would take care of her.
Elisha told Detective Haight she went to Los Angeles with defendant that night. Defendant took Elisha to a motel. Defendant showed Elisha photos of women who he identified as whores who worked for him. Defendant told Elisha he was a pimp and wanted her to whore for him. Defendant told Elisha that she would have sex with men and get money for it. Defendant again told Elisha that her parents did not care for her. Defendant allowed Elisha to call her parents on his cell phone. When they did not answer the telephone, defendant told Elisha if they had been looking for her they would have answered the phone.
When Elisha finally agreed to work as a prostitute for him, defendant laid out the "rules": she should always grab a man in the groin area to make sure he was not a police officer; she should charge at least $50 for "head" or sex; she was to call defendant before going to a hotel room; and she was to bring the money to defendant immediately after she was paid for sex. Defendant told Elisha that he would buy her pretty clothes and take her to nice places if she followed his directions. Defendant took Elisha shopping and had her hair and nails done. Defendant then took her to a place where two men entered. Defendant told Elisha to do what the men told her to do. One of the men removed his erect penis and said to her, "`Just do it, suck my dick.'" Elisha became afraid and ran out of the room and down the street. Elisha had never done this before and was afraid.
*434 Defendant found Elisha and brought her back to the motel room. Defendant asked Elisha if she ever had any type of sex. Elisha said she had not. Defendant showed Elisha how to put a condom on his erect penis. Defendant then, in a loud voice, ordered Elisha to orally copulate him. Defendant demanded she do so more than once. Elisha was afraid and complied. Defendant then had Elisha lay on her back. Defendant inserted his erect penis into Elisha's vagina. Elisha told defendant in a loud voice to stop because she was in pain. However, defendant continued to have intercourse with Elisha.
The following day, defendant took Elisha to a house party. Elisha met another prostitute identified only as Cinnamon who worked for defendant. Elisha also met other prostitutes. Cinnamon took Elisha into the backyard. While in the backyard, Cinnamon had sex with a man. Elisha saw them having sex and the man gave Cinnamon money. Thereafter, Elisha had sex with a different man and was paid by him. Elisha told Detective Haight that she felt bad about the experience, but felt better after the man gave her the money. Cinnamon told Elisha to give the money to defendant. Elisha said she did not want to give the money to defendant. Defendant hit Elisha with his fist, slapped her, and choked her. Defendant took the money from under Elisha's bra. Defendant told Elisha: "Bitch, it's my money. All of your money is my money." Defendant told Elisha if she acted like that she would end up going to jail. Thereafter, defendant and Elisha returned to the motel, where they spent the night. The following morning defendant apologized to Elisha and took her to Disneyland.
Thereafter, defendant introduced Elisha to street prostitution. Defendant told Elisha she should: not get into a car with Black men or girls; try to be sure the individuals were not police; screen the customers; and get the money first. Elisha then committed acts of prostitution and returned the money to defendant. Elisha made up to $1,500 a day, 7 days a week. Elisha said she worked as a prostitute in Arizona, Washington D.C., New York, Florida, and Nevada. Defendant took Elisha to purchase false identification so that she could fly with other prostitutes to these locations. Detective Haight interviewed Elisha regarding his investigation of defendant at the juvenile hall on October 13, 2003, following her arrest. Elisha told Detective Haight that defendant had been arrested. Defendant's mother told Elisha to go out to work and make money and return it to her for defendant. Detective Haight promised to testify for Elisha in her delinquency proceeding if she would cooperate in this case.

C. Mamie (Counts 3, 4, 9, 10, 18, And 19)
Mamie met defendant at a shopping mall in May 2001, just after her seventeenth birthday. Defendant approached Mamie and told her she was attractive and he admired her body type. Defendant told her he had something she could do. Defendant took Mamie to various restaurants over the next few weeks. On one occasion, defendant took Mamie to a restaurant in Hollywood. Defendant pointed out a scantily clad young woman who was walking past the restaurant. Defendant asked Mamie if she thought she could go out there. Mamie asked defendant what he meant. Defendant told her she knew what he meant and asked if she could turn a trick. Mamie explained that she did not know what that meant. Defendant told Mamie, "You're going to sell your pussy." Mamie told defendant that she was afraid because she had never done that before. Defendant said, "It's easy. Look at them, they doing it."
*435 Defendant told Mamie do not: look at a pimp; get caught up with pimps; and let pimps know "that you a loose bitch." Defendant instructed Mamie to approach a "trick" and say: "Hey, baby, how you doing. Want a date?" Defendant demonstrated how Mamie should proceed. Defendant told Mamie to be certain the individual was not a police officer. Defendant said not to take anything lower than $50 and nothing over $80 for "head." Defendant said Mamie should get $80 to $100 for sex. Defendant dropped Mamie off on Sunset Boulevard to "turn a trick." Mamie "interviewed" a man who approached her. Mamie touched his penis as defendant had directed her to determine if he was a police officer. Thereafter, Mamie went to a room with the man and had sex. Mamie called defendant as she had been instructed. Defendant took all of the $90 to $100 the man had given Mamie.
Mamie went to get into a car. Defendant said, "Where you going little mama?" When Mamie said she was ready to go home, defendant told her, "This ain't no money." Defendant asked her to go back out. When Mamie said she was scared, defendant said, "Go do one more, bitch." Mamie was very frightened that something might happen to her or she would be kidnapped. Mamie continued to work for defendant. Mamie lived in different motels and returned to her house occasionally. Mamie also worked in Phoenix for defendant. Mamie engaged in sexual conduct for money and gave all of the money she earned to defendant.
Shortly after Mamie met defendant, he forced her to have sex a couple of times. Mamie testified that on one occasion, defendant told her he wanted to "fuck" her. When Mamie complained that she did not want to because she was tired, defendant told her, "It's not what you want, it's what I want." Defendant told Mamie: "Lay down. [] Get some of this dick." When Mamie said she did not want to do anything, defendant told her to lie down and ` shut up. When Mamie laid down, defendant told her to open her legs. Defendant began to put his penis inside her. Mamie told defendant to stop. Defendant slapped Mamie and pulled her head up and down by grasping her braids. Defendant continued to have sexual intercourse with Mamie, thrusting hard, and hurting her. Mamie continued to tell him to stop. Defendant told her, "Shut the fuck up." After defendant climaxed, he left his penis inside Mamie. Later that day, defendant ordered Mamie to orally copulate him. Mamie complied because she was afraid he would hit her again.
After that day, defendant forced Mamie to have sex with him on more occasions than she could remember. Once during 2001, when Mamie refused to orally copulate defendant, he put a knife to her neck. Defendant told Mamie that she better do what he told her to do. Mamie told him, "[P]lease, please." Defendant looked at Mamie like he was "crazy." Because in her words, defendant looked like "[h]is last straw or something," Mamie then orally copulated him. Defendant said: `Teah. [] You picked the right option, bitch." Defendant continued to hold the knife against her neck. Defendant then wanted have anal sex with Mamie. Mamie said no because she had never done that before. Defendant repeatedly told Mamie, "I ain't trying to hear that shit." Defendant continued to hold the knife. Mamie told defendant it was going to hurt because she never did it before. Defendant began to swing the knife toward her stating, "What you going to do now?" Mamie continued to beg him, "Please, please." Defendant asked Mamie, "You want me to cut you?" When defendant said, "I ain't going to ask you no more," Mamie bent over for him. *436 Defendant penetrated Mamie's anus with his penis which hurt her.
Mamie tried to stop working for defendant. However, defendant threatened to hurt Mamie or her family. Whenever Mamie went home, defendant called her on the phone and told her to come outside and get into the car. Defendant was waiting a few doors down from her house. Mamie feared he might kill her family members. When Mamie told defendant that she was tired and did not want to work, he hit her. Defendant hit Mamie with a hotel phone and the handle of a knife. On another occasion, defendant pulled out a gun and said: "You see this right here? [] You won't make me use this." Mamie saw defendant threaten another prostitute with the gun in the same way. Defendant's mother sometimes drove her black truck to pick up his prostitutes or their money. Defendant would call Mamie and tell her that his mother was coming to pick up the money. During the time that Mamie worked as a prostitute for defendant, she attempted to save money by hiding it from him. Mamie feared she would be beaten by defendant if she saved money. Mamie hid some money in her vagina. At some point, defendant wanted to have sex, but Mamie said, "No." Defendant found the money when he put his hand in Mamie's vagina.
Defendant told Mamie not to tell anyone including the police about him. Defendant said Mamie should say she did not have a pimp and not mention his name. Defendant said if she told the police about her pimp or his name she would be stabbed 10 times in the chest with a knife. Defendant also threatened Mamie that she would "get a black eye on the game" if she revealed his identity to the authorities. Mamie understood that to mean that something would happen to her or she would be killed. A few weeks before trial, Mamie was told by a man who got out of a car near her house that she would be killed if she testified against defendant. One of defendant's male relatives threatened to kill her if she testified.
Mamie continued to work as a prostitute after she testified against defendant in 2003. She was arrested a few times thereafter. Mamie did not work for a pimp. At the time of trial, Mamie had a legitimate job, received a paycheck, and did not work as a prostitute any longer. Mamie sometimes used the name Nicole J. Defendant gave Mamie that name and another birth date to give to police when arrested.
Detectives Gabriel Munoz and Gary Guevara interviewed Mamie regarding this case on October 8, 2003. Mamie was "scared nervous" and uncertain about the dates various incidents occurred. Mamie told the detectives she first met defendant shortly before her seventeenth birthday. Mamie believed the incident with the knife occurred around the Fourth of July holiday.
At approximately 6:40 a.m. on April 9, 2002, Officer Edan D'Angelo was working in an undercover capacity. Mamie made eye contact with Officer D'Angelo as she walked past his car. Officer D'Angelo made a U-turn and pulled alongside Mamie. Mamie got into Officer D'Angelo's car and propositioned him.

D. Aurelia H. (Count 6)
Portions of the preliminary hearing testimony of Aurelia H., who was unavailable at trial, were read to the jury. Aurelia's birthday was born in May 1986. On August 13, 2003, when she was 17 years old, defendant approached Aurelia at a bus stop. Defendant called Aurelia, who told defendant her name was "Ree Ree," over to his car. Defendant offered to give Aurelia a ride. However, she declined. Defendant asked where Aurelia was going *437 on the bus. Aurelia told defendant she was going to her boyfriend's house in Inglewood. After talking for 10 minutes, Aurelia agreed to take a ride. Defendant did not take Aurelia to her boyfriend's home. Defendant drove Aurelia to a man's house in Inglewood. Defendant called the man on his cell phone. Thereafter, the man came outside. Defendant spoke to the man for a while. Defendant drove away to look for someone to purchase marijuana. Defendant drove to an unidentified woman's house for about 15 minutes. Aurelia believed she would be driven to her boyfriend's house by defendant. Defendant asked if he could "keep [her] a little while longer" and Aurelia answered, "Yeah." Defendant then drove back to the area in Los Angeles where they originally started out. Defendant drove to a bail bond office and then took Aurelia to a room at the Motel 6 in Hollywood. While there, defendant received a call on his cell phone. Defendant said he had to go pick up his friend. Aurelia wanted to leave, but was afraid to leave or tell defendant she wanted to go.
Aurelia was driven by defendant in a light green Cadillac to Van Nuys. Defendant spoke to a woman identified only as "Special" on his walkie-talkie cell phone. Defendant told Special to walk from the police station to a car dealership down the street, where they were waiting. Defendant went to look at a truck on the car dealership lot. Defendant asked Special if Ree Ree (the false name used by Aurelia) was going buy the truck for him.
Defendant drove back to the Motel 6 with Aurelia and Special. Aurelia did not want to go to the hotel. She did not say anything because she Was afraid. Defendant told Special that he had not told Aurelia what he actually was. But defendant said he thought Aurelia had an idea what he did for a living., Defendant then told Aurelia that he was a pimp and that Special was his "Ho." Aurelia knew that meant Special worked for him as a prostitute. Defendant then told Aurelia that she was a bitch. Defendant asked if she knew the difference between a bitch and a Ho. When Aurelia said, "No," defendant said, "A Ho gets paid for fucking, and a bitch fucks for free." Special took a shower while Aurelia sat on the end of the bed watching television. Defendant was lying at the head of the bed. Although there was a phone in the room, Aurelia did not know if she needed a phone card to make a call. Because she was afraid, Aurelia wanted to call home. She was afraid to leave because she did not know where she was or how to get home. Defendant left Aurelia in the room with Special.
Thereafter, defendant telephoned and told Special to come downstairs with Aurelia. The three got back into the car and returned to the area of 69th Street where defendant had picked up Aurelia. They sat in the car without speaking. After Special received a call from another prostitute, Mercedes, they drove to the Hawthorne area. Mercedes said that she had "got into it with her daddy," which referred to her pimp. Special had also called defendant "her daddy." Mercedes was afraid to get into the car when they arrived because her pimp was in the area. Mercedes continued to speak to Special on the phone. Defendant got out of the car to "interview" Mercedes, leaving Aurelia with Special. Aurelia did not try to leave because it was dark outside and she did not know how to get home. Aurelia did not call her mother or boyfriend.
When defendant got back into the car, they drove back to 69th Street. Special was dressed in "really short" shorts, a tank top, and stiletto shoes. Special said she wanted to work on Century Boulevard. Defendant drove Special to Century Boulevard, *438 where she got out of the car. Defendant then parked on a back street. Shortly thereafter, Special called defendant to say she had been stopped by the police. Defendant explained that: a "Ho" is supposed to "stay in pocket"; she is never supposed to talk to another pimp; nor is she to even look at another pimp. According to defendant, a pimp is supposed to do everything for his prostitute.
Aurelia slept in the car with defendant and Special that night. The following morning defendant asked Aurelia if she would go on a date. Aurelia understood that to mean: "to go out and find a trick"; a "trick" was a person who picks up a prostitute; and they engage in sex for money. Aurelia told defendant: "`No. I'm scared.'" Defendant said he wanted to find a better place for Aurelia. Defendant drove to Imperial Highway. Defendant explained to Aurelia that she should ask the "trick" if they were police. If they said "No," she was to either have them touch her breasts or she should touch them. Defendant gave Aurelia some condoms and told her to always stay protected. Defendant told her to charge $50 for "head" and $100 for sex. Aurelia understood "head" to mean that she would orally copulate the man. She also understood that sex meant sexual intercourse. Defendant showed Aurelia where the hotel was located. Defendant also told her that she might have to do "a car date" or have sex in the car. Defendant told Aurelia never let anyone approach her on a main street and not to go on a side street. (When Detective Haight interviewed Aurelia on August 19, 2003, Aurelia told him she refused to get out of the car at this point. Aurelia did not know if she told Detective Haight that she had repeatedly asked to telephone her mother.)
At the preliminary hearing, Aurelia testified she got out of defendant's car. However, the "date" she had did not ask her to do anything. They merely talked for 10 minutes while standing on the street next to defendant's car. The man gave Aurelia $20, which she in turn gave to defendant. Aurelia got back into defendant's car. Defendant drove back to 69th Street and Figueroa. Special had been "working" on Imperial Highway. When Special returned, she gave money to defendant. Thereafter, Aurelia did not leave the car, telephone her mother, or go to her boyfriend's house.
Defendant drove Aurelia to Arizona. Aurelia did not want to go to Arizona. While driving there, defendant told Special, "`She better make some money when we get to Phoenix.'" Defendant told Aurelia, "`I'm sick of you bitch not working for me, not making me any money[.]'" That evening, defendant stopped at the Flying J. truck stop in Parker, Arizona, where they slept in the car. Early the next morning, Aurelia got out of the car to use the bathroom. Aurelia telephoned her boyfriend and later the police. Aurelia told the police that she had been kidnapped. The police told Aurelia to stay at the truck stop. However, defendant and Special came looking for Aurelia and she got back into the car. Defendant's car was later stopped by the police in Arizona.

E. Orlaith D. (Counts 7, 8, And 20)
Orlaith was born in March 1989. On January 11, 2003, when Orlaith was 13 years old, she was in the Greyhound bus station in Los Angeles. Defendant approached Orlaith and said she looked like she was lost. Defendant asked Orlaith if she needed help. Orlaith told defendant that she was lost and had run away. Defendant asked Orlaith if she wanted to go with him. Orlaith said, "If you don't rape me, okay." Defendant told Orlaith, "I won't rape you." .Orlaith left with defendant *439 in an older blue Cadillac. Defendant stopped at his mother's house, then drove to his house at 69th and Figueroa Streets. Defendant asked Orlaith her age. Orlaith told defendant that she was 16 years old. Orlaith told defendant where she was from and that she had run away from home. Defendant told her he was a pimp. One of defendant's "girls" had been at his home when they arrived. Orlaith slept on defendant's couch that night.
The following day, defendant took Orlaith for a drive. Defendant gave Orlaith make-up. Defendant introduced Orlaith to one of his prostitutes named "Coco." Orlaith did her make-up and hair and got dressed up before going out to the "track," which she later learned is where the prostitutes walk up and down on the street. Orlaith had an idea that she was going to act as a prostitute. Orlaith had not done that before. Defendant, who she knew as "Mac-Bone," gave Orlaith some rules: always use a condom; get the money first; and call him if she gets in any trouble. Defendant gave her condoms. Because Orlaith had never orally copulated anyone, Coco showed her how to have oral sex. Orlaith put defendant's erect penis into her mouth while Coco gave her instructions on how to proceed. Orlaith felt she had to go out and work for defendant because: she had run away from home and felt it was a "lose-lose" situation; she had nowhere to go and no money; and defendant had been very nice to her.
When Orlaith went out on the "track," defendant instructed her not to look at Black men because they were pimps. Defendant told Orlaith not to get into a car with "some race like with dark hair and eyes" because they had injured prostitutes in the past. Defendant also told Orlaith to make the "trick" feel her "boob" or see his penis to be certain he was not a police officer. Orlaith memorized the phone numbers for defendant and a half-brother, Jamie, who lived on the same property. Orlaith engaged in acts of prostitution, charging $80 for oral sex and $100 for intercourse, as defendant had directed her. The first time Orlaith forgot to ask for the money before she had sex. The man never gave her the money. When Orlaith told defendant, he just told her to be careful next time. Thereafter, Orlaith asked for the money first and gave it all to defendant. Orlaith did not want the money because she felt "empty inside" and "had no feelings really at the time."
Orlaith was with defendant for four days. Orlaith was arrested on the fourth day. Orlaith was placed in a foster home because her parents were in Utah. Orlaith called defendant because she did not want to stay in the foster home. Defendant came to get her. When defendant learned Orlaith's true age, he had her call her parents. Orlaith took a bus to Las Vegas to meet her parents. Orlaith ran away again in August or September 2003. Orlaith stole her parents' car and returned to Los Angeles. Orlaith attempted to contact defendant, but was unable to do so. She then returned to engaging in acts of prostitution until she was arrested.

F. Detective Haight's Investigation
Detective Haight had extensive training and experience as a vice officer. He had worked in that capacity since 1988. Detective Haight had spoken to thousands of prostitutes and hundreds of pimps. He was familiar with: the places where prostitutes work; the involvement of organized crime in prostitution; escort services; and street pimps. On August 15, 2003, Detective Haight interviewed Aurelia at her residence in connection with this case. Aurelia's mother and a boyfriend were present at the time. Aurelia gave Detective Haight two condoms and a lottery ticket *440 on which the telephone number XXX-XXX-XXXX was written. Detective Haight then made arrangements to extradite defendant from Arizona. Based upon the information given to him by Aurelia, Detective Haight queried a computer database that lists victims, witnesses, and suspects. As a result, he located two additional victims. Detectives who were sent to juvenile hall also located Orlaith and Elisha.
Detective Haight interviewed Kaleena on August 16, 2003. Detective Haight sent two other officers to interview Mamie the same day. On September 2, 2003, Detective Haight drove to Parker, Arizona and picked up defendant. Defendant was known to Detective Haight as Marlon Brandon and "Mac Bone." On September 19, 2003, Detective Haight interviewed Orlaith at juvenile hall. On October 13, 2003, Detective Haight interviewed Elisha at juvenile hall.
According to Detective Haight, Mamie appeared "terrified" when she testified at the preliminary hearing in this case. Mamie covered her face with her hair. Mamie was shaking, breathing rapidly, and crying. Mamie's voice was at an elevated pitch and quivered. Aurelia also appeared very nervous, fearful, and was in an agitated state at the preliminary hearing. Aurelia was shaking and her voice was elevated. Aurelia had become uncooperative. Elisha did not appear at the preliminary hearing.

G. Opinion Testimony
Detective Haight testified it was not unusual for prostitutes to be uncooperative because they are afraid of their pimps. Prostitutes live in a world where their pimp is their protector, disciplinarian, father, mother, and family. Prostitutes have been told repeatedly not to trust the police and often blame themselves for their victimization.
Typically, according to Detective Haight, prostitutes are indoctrinated into "the game." They are repeatedly told what their role involves as well as that of their pimps. They only associate with their customers, "Johns," or "tricks," outside the game. The only support a prostitute receives is from other prostitutes or their pimp. The pimp usually finds out what the prostitute needs most and does his best to fulfill that necessity. That is known as "the hook," because the pimp provides, love, friendship, clothes, and most importantly "praise." If the prostitute does anything outside the rules, retribution or punishment can be physical or psychological. Prostitutes routinely are not allowed to look at another pimp. This is known as "the choosing rules." If the prostitute makes eye contact with another pimp, that gives him the right to come up and talk to her and get her to work for him. The "track" is a location or area where street prostitution occurs. Customers know to go there to find prostitutes. When a prostitute works without her pimp present, she is called "an automatic." When a pimp is in custody, prostitutes often bring money and place it on his jail or prison account. A prostitute is required to give all of the money she earns for having sex to her pimp. If a pimp finds out that a prostitute holds money back for herself, she will be disciplined. There is a high recidivism rate for prostitutes even when they receive help and counseling to get out of prostitution.
Dr. Lois Lee, founder and president of Children of the Night, had a Ph.D. in social psychology and a law degree. Children of the Night is a program designed to provide intervention in the lives of children, aged 11 to 17, who have been victimized by prostitution. Dr. Lee had done extensive research on prostitution since 1973. She began working with prostitutes at that time. Dr. Lee had offered opinion *441 testimony on pimping and prostitution in state and federal courts on 10 to 12 occasions. Dr. Lee had met thousands of prostitutes and over 100 pimps in that time.
Dr. Lee was aware of approximately 22 strategies that a pimp might use to get young women involved in prostitution and maintain them in an "apprenticeship program." A pimp will look to identify a young girl who is lonely, alienated, who may have been sexually abused, and has no strong ties to the community or family. In what is known as "the deep quiz," the pimp befriends the potential prostitute and determines what she cares about. The pimp then uses this information to keep her in the role of a prostitute. The pimp looks for young women in places where they should not be alone such as: bus benches late at night; outside of school when they should be in the classroom; arcades; concerts; and shopping malls. The pimps get the most money for younger girls. It is not unusual for a girl to become a prostitute at age 11 if she had been sexually abused when she was an infant and toddler.
To get a young woman involved in prostitution, the pimp might take her to dinner, buy her clothes, and sweet talk her. The pimp might tell her that all that the world wants from her is sex. The pimp demonstrates that people in the street drive up around her and proposition her, while setting himself apart as different from those that would sexually abuse her. He uses sex as a reward when he has sex with her himself. The pimp presents prostitution as a temporary solution for a problem such as the need for money. He might suggest he is building a business so that they can get married and she can have his baby. A pimp presents himself as a rescuer, who rescues the potential prostitute from a life of abuse. A prostitute refers to her pimp as her "daddy." A pimp teaches each prostitute that she is important to him for a different reason to insure that the women will compete in terms of his expectations. A pimp might pair up prostitutes according to their differences to compete against one another. A pimp might also have sex with his prostitute to humiliate her by: having sex against her will; having others watch; or by requiring her to have sex with more than one person. A pimp might also use a "pimp stick," which is often a coat hanger that is heated and used to strike the back of the prostitute's legs. The pimp often follows violence with lovemaking to confuse her and keep her off guard. The pimp uses violence to exercise control to insure the prostitute does not: leave; reveal his identity to the authorities; or choose another pimp. At times, acts of violence are committed against other prostitutes so a young woman may witness the brutality and realize it could happen to her as well.
According to Dr. Lee, prostitutes are usually afraid to leave the pimp. There are very few places for them to go. If a prostitute tries to save up money, it is considered to be stealing from the pimp, and she could suffer severe consequences. Other prostitutes that are competing for the pimp's attention might tell him if a prostitute keeps money. Prostitutes are told not to discuss their pimp with anyone, including: other girls; other pimps; and especially the police. The prostitutes are told that the police will treat them more leniently if they do not have a pimp. Women who have worked as prostitutes for many years may feel threatened by younger women who join the "family." These women might tell the police about the pimp as a way to escape from his control.
Dr. Lee believed it would not be unusual for a pimp to pick up a 16-year-old youngster at a bus stop and keep her for two *442 days. The pimp would employ strategies to introduce the teenager to prostitution. The pimp might use alcohol or marijuana as a strategy. If she were afraid to work as a prostitute, it would not be unusual for the pimp to take her out of state to increase her dependence upon him. It would not be unusual for her to be afraid to testify against the pimp because of his friends who were not in custody who might seek retribution.
Based upon her training and experience, Dr. Lee believed it would not be uncommon for a young woman who worked for a pimp from age 11 to 17 to be on "automatic." That would involve less supervision from the pimp. This would be true even if the pimp were in custody. The prostitute might continue to earn money and give it to someone for the pimp. The prostitute might believe that the pimp loves her or be fearful that others on the outside would hurt her or someone close to her on his behalf. Nor would it be uncommon for such a young woman to deny that she worked for the pimp. According to Dr. Lee, a pimp generally denies assuming responsibility for the prostitute's role. The pimp convinces her that prostitution is something she decided to do. As a result, the prostitute is led to believe she is the "bad person."
Dr. Lee testified a pimp might stage a situation where he pays a man to act as a customer. The pimp might instruct the prostitute to give the man a pill in his drink. After she does so, the man pretends he is dead. The pimp has friends remove the body and put it in the trunk of a car. The pimp would then tell the prostitute that he had to pay off the police. As a result, the prostitute is indebted to him to pay him back for the alleged payoff to the police or be turned in for murder.
Dr. Lee believed it was not uncommon for a prostitute to recant her prior statement or testimony due to fear or the belief that she might be arrested for something she may not have even done. For the same reasons, a prostitute may lie about the length of time she has been working as a prostitute. A prostitute who may have worked for a pimp for two years might testify that she hates the life. But Dr. Lee testified the women might continue working as a prostitute thereafter. Prostitutes often have nowhere to go, no social skills, and possible drug or alcohol dependency. It is also embarrassing for the prostitute to testify about the sexual relations they have with the pimp before a judgmental audience.

III. DISCUSSION

A. Mamie's Testimony

1. Factual and procedural background
Defendant argues the fact that Mamie wore dark sunglasses and a scarf during her testimony denied him his Sixth Amendment right to confrontation and to a fair trial. During the course of the trial, the prosecutor reported that Mamie, who had been subpoenaed as a witness, had come to court but was unwilling to testify due to fear. Outside the juror's presence, Mamie took the stand and reported that following her preliminary hearing testimony, someone told her that something would happen to her if she testified at trial. The prosecutor requested that the trial court find Mamie unavailable as a witness pursuant to Evidence Code section 240, subdivision (a)(3) or Code of Civil Procedure section 1219, subdivision (b). Defense counsel noted for the record that Mamie was wearing a scarf that covered her head and dark sunglasses that concealed her eyes. In addition, Mamie looked away from defendant and defense counsel. The trial court indicated that it had no intention of incarcerating Mamie in order to secure her *443 testimony. Thereafter, the trial court advised Mamie that nothing would happen to her in the courtroom. Mamie stated that she did not want to testify. Mamie said she was told by a male who came to her house that if she testified again that something would happen to her. Mamie explained that she was a mother and did not want to be looking over her shoulder. Mamie was also afraid something could happen to her child. Mamie explained this to the prosecutor. Mamie discussed her fears for the first time on the day she was to testify.
The trial court then inquired whether she might change her mind and testify at trial. Mamie stated two different people had approached her regarding her testifying. Mamie said the individual told her if she were to testify against defendant like she did the first time, something would happen to her. The man said, "`And I'm not playing ... this time.'" He also said, "`If you testify against him again something will seriously happen to you or your child.'" A second individual told Mamie: "`I'll hurt you and kill you. We know where you live ..."' Mamie cried while testifying outside the jurors' presence.
The trial court indicated outside her presence that Mamie had sufficiently demonstrated that she was in an "extreme traumatic condition." The trial court stated that it was inclined to determine Mamie unavailable and utilize her preliminary hearing transcript if sufficient decisional authority supported that decision. In the meantime, the trial court decided to keep Mamie outside the courtroom in the event she changed her mind. Defense counsel noted that Mamie wore the scarf and sunglasses while testifying. The prosecutor subsequently informed the court that Mamie had agreed to testify. All of the foregoing proceedings occurred outside the jurors' presence.
Mamie was then brought in before the jurors returned to the courtroom. Defense counsel noted for the record: "[S]he is still wearing the very dark sunglasses hiding most of her face above her nose, and the green scarf that we talked about earlier. [¶] If she testifies in that state I would object under the Sixth Amendment and right to confrontation by both federal and state constitution]." The trial court responded: "Your right to confrontation gives you the right to be in the courtroom with the witness, your right to confrontation gives you the right to ask questions of the witness. [¶] This witness is visible for your observation if you wish to see, and most importantly the witness is available for observation by the triers of fact. As a matter of fact, she's less than ten feet from the triers of fact. [¶] And that's the court's ruling in this regard." Thereafter, defense counsel inquired, "Would the court concur, though, that you can't see her face through the dark glasses?" The trial court responded: "I don't concur at all. I do concur she has on glasses and something covering the top of her head; the very top of her head is exposed. I don't see where that is an impediment at all for the defense to observe this witness while she is in court. [¶] At any rate, whatever observations the defense makes, the defense is at no disadvantage. Everyone is seeing the exact same thing and playing on the same field."
After Mamie had answered approximately eight questions, the trial court asked the jurors to leave the courtroom. The trial court asked a man in the audience his name. The man was identified as Lennard McCullough. Mr. McCullough was a friend of defendant. Mr. McCullough was asked to leave the courtroom, the trial court noted: "First of all, Mr. McCullough was asked to leave the courtroom because at approximately 1:40 p.m. *444 he walked into the courtroom, this witness had been on the stand for maybe two minutes prior to the time he walked into the courtroom. [¶] The court finds that his entering into the courtroom it was fairly obvious at that point. And again this court believes it would be in the best interest of trying to elicit testimony if he were not present." Following Mamie's first day of testimony, trial counsel stated, "Just for the record, throughout her testimony she maintainedMs. Mamie D. maintained the scarf and of the dark glasses." Thereafter, defense counsel reiterated his continuing objection under the Sixth Amendment and the Confrontation Clause.
Prior to the second day of testimony, the prosecutor, Michelle Pincus, provided additional information concerning Mamie's fears. According to Ms. Pincus, one week prior to trial, Mamie had received a telephone call from defense counsel. Mamie was fearful that her personal information had been given to the defense. Mamie had previously been assured that she would only be contacted through the prosecutor's office. Defense counsel acknowledged that he had spoken to Mamie's mother by telephone. During a recess in Mamie's testimony, defense counsel renewed his previous continuing objection and indicated he further objected to Mamie's scarf and sunglasses under Evidence Code section 352 as unduly prejudicial. Defense counsel acknowledged that Mamie had removed the scarf.
Defendant's new trial motion was based in part on Mamie's testimony while wearing sunglasses and a scarf. At the time the motion was heard, the prosecutor noted: "[D]uring the trial and after the trial two victims who testified in this case, Kaleena [R.] and Mamie D. were threatened and/or assaulted for having testified in this case, and cases are pending against those individuals. And the assaults and the threats were based specifically upon their testimony in this trial." In denying the new trial motion, the trial court noted, "[T]he court again will rely on its ruling during the course of the trial itself."

2. Defendant was not denied any constitutional rights
The United States Supreme Court has held: "The Sixth Amendment's Confrontation Clause provides that, `[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" (Crawford v. Washington (2004) 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177; see U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; Maryland v. Craig (1990) 497 U.S. 836, 844, 110 S.Ct. 3157, 111 L.Ed.2d 666; Delaware v. Van Arsdall (1986) 475 U.S. 673, 678-679, 106 S.Ct. 1431, 89 L.Ed.2d 674.) However, the Supreme Court clarified in Maryland v. Craig, supra, 497 U.S. at page 844, 110 S.Ct. 3157, "We have never held, however, that the Confrontation Clause guarantees criminal defendants the absolute right to a face-to-face meeting with witnesses against them at trial." (Original italics; see People v. Williams (2002) 102 Cal.App.4th 995, 1006-1007, 125 Cal.Rptr.2d 884.) The Supreme Court further held: "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." (Maryland v. Craig, supra, 497 U.S. at p. 850, 110 S.Ct. 3157; accord Coy v. Iowa (1988) 487 U.S. 1012, 1021, 108 S.Ct. 2798, 101 L.Ed.2d 857; Ohio v. Roberts (1980) 448 U.S. 56, 64, 100 S.Ct. 2531, 65 L.Ed.2d 597, overruled on another point in United States v, Gonzalez-Lopez (2006) ___ U.S. ___, ___, 126 S.Ct. 2557, 2562, fn. 1, 165 *445 L.Ed.2d 409.) On another occasion, the United States Supreme Court has held, "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose ... infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." (Delaware v. Fensterer (1985) 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15; see Ohio v. Roberts, supra, 448 U.S. at p. 69, 100 S.Ct. 2531 [substantial compliance with confrontation requirements where witness was under oath, subject to cross-examination, and testified before a court]; California v. Green (1970) 399 U.S. 149,165-168, 90 S.Ct. 1930, 26 L.Ed.2d 489 [witness's preliminary hearing testimony, which was subject to cross-examination, satisfied the Confrontation Clause].) In Craig, a case involving the testimony of child abuse victim witnesses by closed circuit television, the United States Supreme Court concluded: "[W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." (Maryland v. Craig, supra, 497 U.S. at p. 857, 110 S.Ct. 3157; see People v. Thomas (2005) 130 Cal.App.4th 1202, 1208, 30 Cal.Rptr.3d 582.)
Here, the trial court found that Mamie was afraid to testify. When she took the stand outside the jurors' presence, she related under oath that she had been threatened by two different individuals on separate occasions. Mamie was afraid that either she or her family members would be harmed. The trial court also found that Mamie was in an "extreme traumatic condition" while testifying before the jury was brought into the courtroom. The trial court indicated that it was inclined to find Mamie to be unavailable and utilize her preliminary hearing transcript if sufficient decisional authority supported such an order. When Mamie ultimately agreed to testify, defense counsel again objected to the scarf and sunglasses she wore. The trial court responded: "Your right to confrontation gives you the right to be in the courtroom with the witness, your right to confrontation gives you the right to ask questions of the witness. [¶] This witness is visible for your observation if you wish to see, and most importantly the witness is available for observation by the triers of fact. As a matter of fact, she's less than ten feet from the triers of fact. [¶] And that's the court's ruling in this regard." Thereafter, defense counsel asked whether the court agreed that Mamie's face could not be seen through the sunglasses. The trial court responded, "I don't concur at all." Mamie cried and had to compose herself several times during the testimony. The record reflects that the presence of a Mr. McCullough, a self-proclaimed "friend" of defendant, in the courtroom served to intimidate Mamie while she testified.
The court, jury, and defendant were able to hear Mamie's testimony and responses to cross-examination while observing her facial expressions and body language to a degree that no constitutional violation occurred. (See Maryland v. Craig, supra, 497 U.S. at p. 851, 110 S.Ct. 3157 ["Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation-oath, cross-examination, and observation of the witness' *446 demeanor-adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing"]; Morales v. Artuz (2nd Cir.2002) 281 F.3d 55, 60-61 [Although witness wore sunglasses during her testimony because she feared defendant, "The obscured view of the witness's eyes ... resulted in only a minimal impairment of the jurors' opportunity to assess her credibility"]; Commonwealth v. Lynch (2003) 439 Mass. 532, 789 N.E.2d 1052, 1059-1060, ["Even if [the witness] had worn dark glasses of some type, there is no basis on which to conclude that it created a substantial likelihood of a miscarriage of justice. `Face to face' confrontation does not mean `eye to eye,' see Commonwealth v. Kater [ (1991) 409 Mass. 433] 567 N.E.2d 885, [892-893] and wearing dark glasses does not prevent exposure of a witness's face"].) In light of Mamie's fear, which was evident to the court both before and during her testimony, it was not unreasonable nor a violation of the Fourteenth Amendment due process clause to allow her to wear sunglasses and a scarf while testifying. The trial court neither abused its discretion nor violated defendant's due process rights by allowing Mamie to wear the sunglasses and scarf. Nor did any error occur in the manner in which the trial court considered the facts before it in refusing to direct Mamie to remove her sunglasses and scarf.
Moreover, any error in allowing Mamie to testify in sunglasses and a scarf was harmless beyond a reasonable doubt. (Delaware v. Van Arsdall, supra, 475 U.S. at p. 684, 106 S.Ct. 1431; Chapman v. California (1967) 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705.) In assessing whether a violation of the right to face-to-face confrontation is harmless beyond a reasonable doubt, we apply the following analysis: "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." {Delaware v. Van Arsdall, supra, 475 U.S. at p. 684, 106 S.Ct. 1431; see Coy v. Iowa, supra, 487 U.S. at pp. 1021-1022, 108 S.Ct. 2798; People v. Mitchell (2005) 131 Cal. App.4th 1210, 1225-1226, 32 Cal.Rptr.3d 613.) The corroborating evidence included defendant's pandering and pimping other young women and girls and the fact he was arrested driving through Arizona with 17-year-old Aurelia. The staggering weight of the evidence of ongoing prostitution related criminal conduct independently described by young women and girls, none of whom there is any reason to believe knew each other, renders any purported error harmless beyond a reasonable doubt. No reversible error occurred.

B. Opinion Testimony

1. Factual and procedural background
Prior to trial, defense counsel objected to the testimony of Dr. Lee, whose proposed testimony related to: the culture of prostitution and pimping; the behavior of pimps and prostitutes; and the nature of prostitution, which is akin to battered woman syndrome and rape trauma syndrome. Defense counsel objected questioning: "Is there something about prostitutes that needs to be explained to the triers of fact on whether or not they're telling the truth or whether or not their credibility or whether or not they are somehow more credible than others? In other words, is it something to help explain *447 or to help the triers of fact in determining the facts of the case? Because explaining behavior without telling what behavior they're going to explain seems a little bit ambiguous to me." In allowing Dr. Lee to testify, the trial court ruled: "Based upon the limited information that I have at this point in time the witness [Dr.] Lee will be allowed to testify. [¶] The court believes thatfor lack of a better termthe self-culture, whatever, pimping and pandering, is outside of the knowledge of the average person who is not associated with or has taken the time to become knowledgeable about that sub-culture. And again, before Ms. Lee, Dr. Lee testifies, defense counsel, you might have some more specific questions if you wish. [¶] But at this point she is going to testify."

2. Forfeiture
For the first time on appeal, defendant challenges Dr. Lee's qualifications to testify. Defendant argues: "In short, [Dr.] Lee, for all her laudable shelter work, is a bit of a cottage industry, and her testimony a bid for prostitute empathy, not the stuff of genuine expertise." Defendant further argues: "[Dr.] Lee's `strategies' appear to. be her sauce-like reduction of information gleaned from pimp biographies and her advocate-based conversations with pimps and prostitutes." Defendant's only objections to Dr. Lee's testimony at trial were based upon relevance and its cumulative nature. The California Supreme Court has held that a failure to challenge the qualifications of a witness to offer an opinion based on special skill, training, and experience at trial constitutes a forfeiture of the issue on appeal. (People v. Bolin (1998) 18 Cal.4th 297, 321, 75 Cal.Rptr.2d 412, 956 P.2d 374; People v. Williams (1997) 16 Cal.4th 153, 194-195, 66 Cal.Rptr.2d 123, 940 P.2d 710; People v. Roberts (1992) 2 Cal.4th 271, 298, 6 Cal.Rptr.2d 276, 826 P.2d 274.) Thus, defendant's contention Dr. Lee was not qualified to offer opinions concerning prostitution has been forfeited.

3. Dr. Lee was qualified to testify.
Notwithstanding that waiver, Dr. Lee's credentials to testify were established during her testimony. Evidence Code section 720 provides: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert, (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony." (See also People v. Bolin, supra, 18 Cal.4th at p. 321, 75 Cal.Rptr.2d 412, 956 P.2d 374; People v. Killebrew (2002) 103 Cal.App.4th 644, 651, 126 Cal.Rptr.2d 876.) Dr. Lee had a Ph.D. in social psychology as well as a law degree. Dr. Lee had done extensive research on prostitution since 1973. Dr. Lee had founded Children of the Night, which provided intervention for children, aged 11 to 17, who had been involved in prostitution. In that capacity, Dr. Lee had spoken to thousands of prostitutes and over 100 pimps. Dr. Lee had offered opinions in state and federal courts based on her special background regarding prostitution. Dr. Lee had also trained law enforcement officers throughout the nation regarding victimization by prostitution. She had also written numerous articles and a paper on pimping strategies.

4. Without abusing its discretion, the trial court could conclude Dr. Lee's testimony involved matters beyond common experience
Evidence Code section 801 provides: "If a witness is testifying as an *448 expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (See also People v. Brown (2004) 33 Cal.4th 892, 905-908, 16 Cal.Rptr.3d 447, 94 P.3d 574; People v. Humphrey (1996) 13 Cal.4th 1073, 1088, 56 Cal.Rptr.2d 142, 921 P.2d 1; People v. McAlpin (1991) 53 Cal.3d 1289, 1300, 283 Cal.Rptr. 382, 812 P.2d 563; People v. Cole (1956) 47 Cal.2d 99, 103, 301 P.2d 854.) We review a challenge to whether a witness's opinion testimony is beyond common experience for an abuse of discretion. (People v. McAlpin, supra, 53 Cal.3d at p. 1299, 283 Cal.Rptr. 382, 812 P.2d 563; People v. Kelly (1976) 17 Cal.3d 24, 39, 130 Cal.Rptr. 144, 549 P.2d 1240.) We may not reverse a trial court's exercise of discretion in determining whether a subject is beyond common experience and its admission will assist the jurors absent a showing that it was arbitrary, capricious, or patently absurd. (People v. Ochoa (2001) 26 Cal.4th 398, 437-438, 110 Cal.Rptr.2d 324, 28 P.3d 78; People v. Bolin, supra, 18 Cal.4th at pp. 321-322, 75 Cal.Rptr.2d 412, 956 P.2d 374; People v. Bloyd (1987) 43 Cal.3d 333, 357, 233 Cal.Rptr. 368, 729 P.2d 802.)
Defendant argues, "[T]he only real issue the expert testimony here addressed was the credibility of the prostitute-witness...." Defendant further argues that in comparison to such phenomena as rape trauma, battered wife, and child sexual abuse accommodation syndromes, the "prostitution strategies" referred to by Dr. Lee were within the common knowledge or experience of a reasonable trier of fact. We disagree. In People v. Brown, supra, 33 Cal.4th at page 906, 16 Cal.Rptr.3d 447, 94 P.3d 574, the Supreme Court held, "[I]n [People v.] McAlpin, supra, 53 Cal.3d 1289, 283 Cal.Rptr. 382, 812 P.2d 563, we made it clear that admissibility of expert testimony does not depend on a showing based on a recognized `syndrome.'" The Supreme Court has also explained: "The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would every be heard. Instead, the statute declares that even if the jury as some knowledge of the matter, expert opinion may be admitted whenever it would `assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when `the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness' [citation]." (People v. McDonald (1984) 37 Cal.3d 351, 367, 208 Cal.Rptr. 236, 690 P.2d 709, quoting People v. Cole, supra, 47 Cal.2d at p. 103, 301 P.2d 854, disapproved on other grounds in People v. Mendoza (2000) 23 Cal.4th 896, 912-914, 98 Cal. Rptr.2d 431, 4 P.3d 265.) The Brown Court explained that in cases involving the behavior of abused children and their parents, opinion testimony on the common reactions to child molestation was admissible because: "`[E]xpert testimony on the common reactions of child molestation victims ... is admissible to rehabilitate such witness's credibility.... Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual *449 abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" [Citation.]" (People v. Brown, supra, 33 Cal.4th at p. 906, 16 Cal.Rptr.3d 447, 94 P.3d 574, quoting People v. McAlpin, supra, 53 Cal.3d at pp. 1300-1301, 283 Cal.Rptr. 382, 812 P.2d 563.) The Brown court then drew the analogy to domestic violence cases where the victim's testimony may be inconsistent with what was earlier told to the police. (People v. Brown, supra, 33 Cal.4th at p. 906,16 Cal.Rptr.3d 447, 94 P.3d 574.)
Contrary to defendant's argument, the trial court could reasonably find Dr. Lee's experience with child prostitutes was relevant in this case to "disabuse" the jurors of their possible misconceptions concerning prostitutes and their testimony. The trial court, without abusing its discretion, could find there were misunderstandings or no understanding at all as to why a prostitute might change her testimony out of fear or embarrassment because of conduct or loyalty to a pimp. In fact, many of the victims in this case were much like the victims of child abuse, rape, and domestic violence. Moreover, Dr. Lee's testimony was comparable to that of gang investigators regarding the inner workings of street gangs in the community. (See People v. Gardeley (1996) 14 Cal.4th 605, 617-620, 59 Cal.Rptr.2d 356, 927 P.2d 713; People v. Champion (1995) 9 Cal.4th 879, 919, 39 Cal.Rptr.2d 547, 891 P.2d 93; People v. Killebrew, supra, 103 Cal.App.4th at pp. 656-657, 126 Cal.Rptr.2d 876.) No abuse of discretion occurred.

5. Profile evidence
We also reject defendant's suggestion that Dr. Lee's testimony amounted to a type of "profile" testimony prohibited in People v. Robbie (2001) 92 Cal.App.4th 1075, 1084, 112 Cal.Rptr.2d 479. Dr. Lee's testimony related to the experiences of young girls drawn into prostitution by pimps, rather than profiling or categorizing defendant. This is not a case where a hypothetical inquiry was presented to a witness and the circumstances matched those of the charges against the accused as was the case in Robbie and the body of authority it synthesizes. (Id. at pp. 1082-1087, 112 Cal.Rptr.2d 479.) The California Supreme Court has described "profile evidence" of the type to which defendant objects thusly: "In [People v. Walkey (1986) 177 Cal.App.3d 268, 223 Cal.Rptr. 132], the prosecution introduced expert evidence that the most important factor in the profile of a child abuser was that he had himself been abused as a child, elicited an admission from the defendant that he had been abused as a child, then argued that the defendant was guilty because he fit the profile of a child molester. ([Id.] at pp. 276-277 [223 Cal.Rptr. 132].) The Court of Appeal held the evidence inadmissible and the prosecution's argument improper. (Id. at p. 279 [223 Cal.Rptr. 132] )[H] In People v. Robbie, supra, 92 Cal.App.4th 1075, 112 Cal.Rptr.2d 479, a prosecution expert testified that many rapists use only minimal force, and described in detail a scenario in which the rapist is in effect acting as if he thinks of the sexual acts as consensual. (Id. at pp. 1082-1084, 112 Cal.Rptr.2d 479.) Not coincidentally, the behavior the expert described matched the testimony of the alleged victim. The expert conceded that the same behavior would be consistent with a truly consensual encounter. The Court of Appeal in Robbie characterized this evidence as inadmissible `profile evidence.' It explained: `[The evidence] implies that criminals, and only criminals, act in a given way. In fact, certain behavior may be consistent with both innocent and illegal behavior, as the People's expert conceded here.' (Id. at p. 1085, 112 Cal.Rptr.2d 479.) Other cases excluding profile evidence include People *450 v. Castaneda (1997) 55 Cal.App.4th 1067, 1072, 64 Cal.Rptr.2d 395 (drug dealer profile), People v. Martinez (1992) 10 Cal. App.4th 1001, 1006, 12 Cal.Rptr.2d 838 (truck thief profile), and [United States] v. Beltran-Rios (9th Cir.1989) 878 F.2d 1208, 1210 (drug courier profile)." (People v. Smith (2005) 35 Cal.4th 334, 357-358, 25 Cal.Rptr.3d 554,107 P.3d 229.)
In Smith though, the Supreme Court identified when profile evidence is inadmissible: "`Profile evidence,' however, is not a separate ground for excluding evidence; such evidence is inadmissible only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative. [Citation.]" (People v. Smith, supra, 35 Cal.4th at p. 357, 25 Cal.Rptr.3d 554, 107 P.3d 229.) At another point, the Supreme Court noted, "Profile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt." (Id. at p. 358, 25 Cal.Rptr.3d 554, 107 P.3d 229.) We review issues of relevance and undue prejudice for an abuse of discretion. (People v. Panah (2005) 35 Cal.4th 395, 474, 25 Cal.Rptr.3d 672, 107 P.3d 790; People v. Kipp (2001) 26 Cal.4th 1100, 1123, 113 Cal.Rptr.2d 27, 33 P.3d 450.)
Without abusing its discretion, the trial court could reasonably have ruled the testimony at issue was not inadmissible profile evidence. To begin with, Dr. Lee's testimony, which dealt primarily with young women and girls, was pertinent as to why a prostitute would be unwilling to testify against a pimp. Further, none of the inquiries in this case involved defendant's relationship with any of the young women he abused. This is unlike the situation in People v. Robbie, supra, 92 Cal. App.4th at page 1084, 112 Cal.Rptr.2d 479 where the hypothetical questions asked of the State Department of Justice investigator "incorporated" the victim's description of the defendant's conduct. Moreover, there is nothing about the relationship between a pimp and a prostitute which involves pimping, pandering, conspiracy, sexual assault, and other violence as a means to compel obedience that is consistent with innocent conduct. (People v. Smith, supra, 35 Cal.4th at p. 358, 25 Cal.Rptr.3d 554, 107 P.3d 229.) No abuse of discretion occurred.
In any event, any error in admitting Dr. Lee's testimony was harmless. (People v. Coffman and Marlow (2004) 34 Cal.4th 1, 81, 17 Cal.Rptr.3d 710, 96 P.3d 30; People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) If, as defendant argues, the substance of Dr. Lee's testimony was within the common knowledge of the jurors based upon "pop culture," her analysis did not serve to vouch for the credibility of the victims or prejudice defendant. The testimony of each victim served to corroborate the experience related by all of the victims with respect to defendant's actions.

6. The judgment may not be reversed because defense counsel was ineffective [**]

C. Felony False Imprisonment of Kaleena (Count 22)
Defendant argues that there was insufficient evidence to support his conviction for the felony false imprisonment of Kaleena. Defendant argues the force he used to restrain her "was not done with violence over and above that needed to effect the restraint" and hence the evidence is insufficient. In reviewing a challenge of the sufficiency of the evidence, we apply the following standard of review: "[We] consider the evidence in a light most *451 favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (People v. Mincey (1992) 2 Cal.4th 408, 432, 6 Cal.Rptr.2d 822, 827 P.2d 388, fn. omitted; People v. Hayes (1990) 52 Cal.3d 577, 631, 276 Cal.Rptr. 874, 802 P.2d 376; People v. Johnson (1980) 26 Cal.3d 557, 576, 162 Cal.Rptr. 431, 606 P.2d 738.) Our sole function is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Jackson v. Virginia, supra, 443 U.S. at p. 319, 99 S.Ct. 2781, orig. italics; People v. Bolin, supra, 18 Cal.4th at p. 331, 75 Cal.Rptr.2d 412, 956 P.2d 374; People v. Marshall (1997) 15 Cal.4th 1, 34, 61 Cal.Rptr.2d 84, 931 P.2d 262; People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal. Rptr.2d 23, 864 P.2d 103; People v. Barnes (1986) 42 Cal.3d 284, 303, 228 Cal.Rptr. 228, 721 P.2d 110; Taylor v. Stainer, supra, 31 F.3d at pp. 908-909.) The standard of review is the same in cases where the prosecution relies primarily on circumstantial evidence. (People v. Rodriguez (1999) 20 Cal.4th 1, 11, 82 Cal.Rptr.2d 413, 971 P.2d 618; People v. Stanley (1995) 10 Cal.4th 764, 792, 42 Cal.Rptr.2d 543, 897 P.2d 481; People v. Bloom (1989) 48 Cal.3d 1194, 1208, 259 Cal.Rptr. 669, 774 P.2d 698; People v. Bean (1988) 46 Cal.3d 919, 932, 251 Cal.Rptr. 467, 760 P.2d 996.) The California Supreme Court has held, "Reversal on this ground is unwarranted unless it appears `that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (People v. Bolin, supra, 18 Cal.4th at p. 331, 75 Cal.Rptr.2d 412, 956 P.2d 374, quoting People v. Redmond (1969) 71 Cal.2d 745, 755, 79 Cal.Rptr. 529, 457 P.2d 321.) Section 236 provides: "False imprisonment is the unlawful violation of the personal liberty of another." Section 237, subdivision (a) provides in pertinent part: "If the false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in the state prison."
In People v. Bamba (1997) 58 Cal. App.4th 1113, 1123, 68 Cal.Rptr.2d 450, Associate Justice Joanne C. Parrilli explained the relevant elements of a felony false imprisonment charge: "[T]he essential element of false imprisonment is restraint of the person. Any exercise of express or implied force which compels another person to remain where he does not wish to remain, or go where he does not wish to go, is false imprisonment. (People v. Fernandez (1994) 26 Cal. App.4th 710, 717, 31 Cal.Rptr.2d 677.) False imprisonment is a felony if it is effected by violence or menace." Associate Justice Parrilli held: "In this context, `menace' means `"a threat of harm express or implied by word or by act."' [Citation.]" (People v. Bamba, supra, 58 Cal.App.4th at p. 1123, 68 Cal.Rptr.2d 450, quoting People v. Babich (1993) 14 Cal.App.4th 801, 804, 806, 18 Cal.Rptr.2d 60 [defendant's statement that he intended to kill his girlfriend constituted substantial evidence of menace during false imprisonment]; CALJIC No. 9.60; but see People v. Castro (2006) 138 Cal.App.4th 137, 144, 41 Cal.Rptr.3d 190 [despite sufficient evidence to support the felony false imprisonment conviction, facts were sufficiently ambiguous that a conviction for misdemeanor false imprisonment might have been justified had the jurors been so instructed].)
Here, there was substantial evidence of menace. There was testimony defendant quickly approached Kaleena and got close to her face. Kaleena was aware of a rule "on the streets" that a prostitute should not look a pimp other than her own in the eye. To do so could result in that pimp *452 taking the prostitute's money or having to go to work for him. Kaleena attempted to turn to walk away. However, defendant placed his arms around her from behind, trapping her between himself and the gate to his house. Defendant told Kaleena that he wanted her in his "starting lineup." Kaleena understood that to mean that he wanted her in his "first set of Ho's," i.e., to be a prostitute who works for him. Defendant told Kaleena that he had prostitutes in other locations worldwide from which she could choose. Kaleena was afraid because she did not want to go with defendant or work for him. Defendant told Kaleena she could get into either a green Cadillac or the black Cadillac Escalade parked nearby. Defendant told Kaleena that either way she was going to get into one car or another. Defendant told her, "We could do this the easy way by you going into the car; or, we could do this the hard way." Kaleena understood that to mean that defendant was going to physically take her. Kaleena did not want to get into either car. Kaleena was afraid because she had heard stories from other prostitutes. Kaleena did not feel free to leave. Officer Minnick testified defendant's arms were around Kaleena. While surrounding Kaleena with his arms, defendant's hands were clutching the chain link fence. The foregoing constituted substantial evidence of menace supporting defendant's felony false imprisonment conviction.

D. Sentencing

1. overview
The following are the sentences relevant to defendant's section 654, subdivision (a) contentions. As to Mamie, defendant received consecutive subordinate 16-month terms for both pimping (count 3) and pandering (count 4). As to Orlaith, defendant received a 16-month pimping sentence (count 7). He also received a 2-year sentence for procuring a child to engage in a lewd act (count 10). As to Elisha, defendant received consecutive sentences for pimping (count 11) and procuring a child to engage in a lewd act (count 21). As to both Orlaith and Elisha, defendant's pandering sentences were stayed pursuant to section 654, subdivision (a). As will be noted, defendant challenges separate sentences for pimping and either pandering or procuring a child to engage in lewd conduct. The multiple punishment issue is somewhat different as to Kaleena. Defendant asserts separate sentences could not be imposed for attempted pandering (count 10) and false imprisonment (count 22). We agree only with defendant's contentions as they relate to the consecutive pandering and false imprisonment sentences imposed for counts 5 and 22 which involve Kaleena.

2. the trial court properly imposed separate sentences on counts for pimping and pandering or procuring a child to engage in lewd conduct
Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision...." We review the trial court's order imposing multiple sentences in the context of a section 654, subdivision (a) question for substantial evidence. People v. Osband, supra, 13 Cal.4th at pp. 730-731, 55 Cal.Rptr.2d 26, 919 P.2d 640; People v. Downey (2000) 82 Cal.App.4th 899, 917, 98 Cal.Rptr.2d 627; People v. Oseguera (1993) 20 Cal.App.4th 290, 294, 24 Cal. Rptr.2d 534; People v. Saffle (1992) 4 Cal. App.4th 434, 438, 5 Cal.Rptr.2d 648.) The *453 trial court has broad latitude in determining whether section 654, subdivision (a) applies in a given case. (People v. Hutchins (2001) 90 Cal.App.4th 1308, 1312, 109 Cal.Rptr.2d 643; People v. Herrera (1999) 70 Cal.App.4th 1456, 1466, 83 Cal.Rptr.2d 307.) In conducting the substantial evidence analysis we view the facts in the following fashion: "We must `view the evidence in a light most favorable to the respondent and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' (People v. Holly (1976) 62 Cal.App.3d 797, 803, 133 Cal.Rptr. 331.)" (People v. McGuire (1993) 14 Cal. App.4th 687, 698, 18 Cal.Rptr.2d 12; see also People v. Green (1996) 50 Cal.App.4th 1076, 1085, 58 Cal.Rptr.2d 259.) Multiple criminal objectives may divide those acts occurring closely together in time. (People v. Hicks (1993) 6 Cal.4th 784, 788-789, 25 Cal.Rptr.2d 469, 863 P.2d 714; People v. Harrison (1989) 48 Cal.3d 321, 335-336, 256 Cal.Rptr. 401, 768 P.2d 1078; People v. Davey (2005) 133 Cal.App.4th 384, 390, 34 Cal.Rptr.3d 811.)
There are three prostitution related statutes that are pertinent to defendant's multiple sentencing contentions as to Mamie, Orlaith, and Elisha. The first statute, pimping, section 266h, subdivision (a) provides in pertinent part: "[A]ny person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper of manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, is guilty of pimping...." The second statute, section 266i defines pandering in part as follows: "(a) ... [A]ny person who does any of the following is guilty of pandering ... [¶] (1) procures another person for the purpose of prostitution, [¶] (2) By promises, threats, violence, or by any device or scheme, causes, induces, persuades or encourages another person to become a prostitute, [¶] (3) Procures for another person a place as an inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this state. [¶] (4) By promises, threats, violence or by any device or scheme, causes, induces, persuades or encourages an inmate of a house of prostitution, or any other place in which prostitution is encouraged or allowed, to remain therein as an inmate. [¶] (5) By fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procures another person for the purpose of prostitution, or to enter any place in which prostitution is encouraged or allowed within this state, or to come into this state or leave this state for the purpose of prostitution." The third prostitution related statute, section 266j, procuring a minor under the age of 16, states in part: "Any person who intentionally gives, transports, provides, or makes available, or who offers to give, transport, provide, or make available to another person, a child under the age of 16 for the purpose of any lewd or lascivious act as defined in Section 288, or who causes, induces, or persuades a child under the age of 16 to engage in such an act with another person, is guilty of a felony...." As defendant acknowledges, the Legislature criminalized both pimping and pandering to discourage prostitution. (People v. Patton (1976) 63 Cal.App.3d 211, 217, 133 Cal.Rptr. 533; People v. Hashimoto (1976) 54 Cal.App.3d 862, 867, 126 Cal. Rptr. 848.)
Defendant committed separate acts of pandering and pimping or procuring a minor with respect to Mamie, Orlaith, *454 and Elisha. Defendant approached 17-year-old Mamie at a shopping mall, told her she was attractive and that he admired her body type. Thereafter, defendant took Mamie out to restaurants for a few weeks. When defendant gained Mamie's trust, he asked her if she could "go out there." Mamie did not understand what he meant. Defendant told her, "You're going to sell your pussy." Defendant then schooled Mamie on the way to approach a "trick," what she should charge, and how to avoid other pimps. These acts support the count 4 pandering conviction. Defendant took Mamie to Sunset Boulevard, where she was to work. After Mamie performed her first act of prostitution, defendant picked her up and took all of the money she earned, insisting that she go back out and earn more. This latter conduct, pimping, was separate and distinct from the pandering. Hence, no error occurred when defendant received consecutive subordinate sentences for pimping and pandering.
As to Orlaith, when she was 13 years old, defendant approached her at the Greyhound bus station in Los Angeles. Defendant offered to help Orlaith who looked lost. Orlaith had run away from home. Defendant introduced Orlaith to one of his prostitutes. Thereafter, defendant gave Orlaith make-up and encouraged her to do her make-up and hair and get dressed to go out on the "track." Again, defendant instructed Orlaith on: using a condom; touching the "trick" to be certain he was not a police officer; not looking at other Black men who were pimps; and getting the money first. Defendant and "Coco" taught Orlaith how to orally copulate a man, using his penis. These acts constituted the count 20 procuring a minor to engage in a lewd act offense. Defendant then sent Orlaith out to perform acts of prostitution and took all of the money she earned which constituted the crime of pimping. Hence, the trial court could impose consecutive sentences for both procuring a minor and pimping.
Defendant also met 11-year-old Elisha at a bus station. Defendant told Elisha she was pretty, asked for her phone number, and told her they would go out on a date. Defendant later met Elisha near her home. Defendant showed Elisha photographs of girls dressed provocatively and offered to buy her things and take her places. Defendant took Elisha to a motel, where he told her he was a pimp and asked her to be a whore for him. Defendant laid out the rules, which included bringing him the money immediately after she was paid for sexual conduct. Defendant took Elisha shopping and had her nails and hair done. These acts support defendant's count 21 conviction for procuring a child to engage in a lewd act. Defendant then took Elisha to a location to have sex with two men. Elisha ran away. Defendant found Elisha and brought her back to the motel. The following day, defendant took Elisha to a house party where she was paid to have sex with a man. Defendant forcefully took the money Elisha was paid. As in the case of Orlaith, these acts support separate sentencing.

3. count 22 should have been stayed
Defendant argues and the Attorney General concedes that the eight-month sentence imposed as to count 22 for the felony false imprisonment of Kaleena should have been stayed pursuant to section 654, subdivision (a). The parties agree that the act of felony false imprisonment, described in part III(C) of this opinion, which occurred on the only occasion when Kaleena and defendant met, occurred as part of his effort to pander by use of threats within the meaning of section 266i, subdivision (a)(2). We agree. As a result, the sentence imposed as to *455 count 22 is stayed pursuant to section 654, subdivision (a).

E. The trial court properly imposed consecutive terms [***]

IV. DISPOSITION
The sentence imposed as to count 22 is stayed pursuant to section 654, subdivision (a). The judgment is affirmed in all other respects.
I concur: ARMSTRONG, J.
MOSK, J., Concurring.
I concur.
On appeal, defendant challenges the admissibility of the testimony of Dr. Lois Lee, who is described as an expert on the culture of pimps and prostitutes. Her testimony suggests that she has had an admirable career in attempting to deal with the problems of child prostitution. Prior to trial, defendant made what amounted to an in limine motion to exclude the testimony of Dr. Lee. The trial court said that, "Based upon the limited information that I have at this point in time the witness Lois Lee will be allowed to testify." The trial court further stated that the culture of pimping and panderingthe subject of Dr. Lee's proposed testimony"is outside the knowledge of the average person who is not associated with or has taken the time to become knowledgeable about that subculture." Defendant did not renew his objection to Dr. Lee's testimony, except as to a few questions.
The failure to renew the objection in this circumstance demonstrates the wisdom of the California Supreme Court's point that the better practice is for the parties to stipulate to the effect of the court's in limine ruling "or for the trial judge to make it clear to counsel at the end of in limine arguments not only what the ruling on the motion is, but whether further objection or argument is desired when the evidence is presented." (People v. Morris (1991) 53 Cal.3d 152, 190, 279 Cal.Rptr. 720, 807 P.2d 949, overruled on other grounds in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.) But the Attorney General does not argue, as it might have in the instant case, that the failure to renew the objection constituted a forfeiture of the issue. (See People v. Morris, supra, 53 Cal.3d at pp. 190-191, 279 Cal.Rptr. 720, 807 P.2d 949; People v. Holloway (2004) 33 Cal.4th 96, 133, 14 Cal.Rptr.3d 212, 91 P.3d 164.)
During the colloquy concerning Dr. Lee's testimony, defendant raised a question as to the purpose of Dr. Lee's testimony, but there never was a clear explanation as to that purpose. The Attorney General asserts it was "to correct misconceptions about the behavior of prostitutes." The prosecutor argued that Dr. Lee's testimony demonstrated the "strategies" of pimps in general. Dr. Lee also purported to suggest why some prostitutes are truthful and some lie. Dr. Lee's testimony is based primarily on her own observations and not on any documented studies.
There is not a clear enough record to determine that the trial court erred by admitting this impactful evidence. Any grounds for exclusion or admission of this evidence are, at best, imprecise. Although I can see some usefulness in examining what might appear to be the inexplicable behavior of the prostitutes in connection with their relationships with pimps, I do have some reservations as to whether the testimony is analogous to the expert evidence approved by such cases as People v. Brown (2004) 33 Cal.4th 892, 895-896, 16 *456 Cal.Rptr.3d 447, 94 P.3d 574 [victims of domestic violence] and People v. Bledsoe (1984) 36 Cal.3d 236, 242-243, 203 Cal. Rptr. 450, 681 P.2d 291 [rape victims], so as to be covered by the principles established by those cases.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 111(B)(6) and III(E).
[1] AH further statutory references are to the Penal Code unless otherwise indicated.
[**] See footnote *, ante.
[***] See footnote *, ante.